**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| TOSCANA CHEESE CO., INC., | (Electronically Filed) |
| Plaintiff, | CIVIL ACTION |
| v. | Civil Action No. _____ |
| SCHRATTER FOODS, INC. d/b/a ANCO FINE CHEESE, INC. and d/b/a CORMAN SHIP SUPPLIES, INC., | |
| Defendant. | |

## <u>NOTICE OF REMOVAL</u>

PLEASE TAKE NOTICE that defendant Schratter Foods, Inc., which does business under the trade names ANCO Fine Cheese and Corman Ship Supplies ("Schratter"), by and through its undersigned counsel, Pepper Hamilton LLP, and pursuant to 28 U.S.C. § 1441, hereby gives notice of the removal of this action from the Superior Court of New Jersey, Hudson County, Chancery Division to the United States District Court for the District of New Jersey. The grounds for removal are as follows:

1.       On or about December 26, 2017, plaintiff Toscana Cheese Co. ("Toscana") filed a complaint ("Complaint") against Schratter in the Superior Court of New Jersey, Chancery Division, Hudson County (the "**Superior Court**").  A true and correct copy of the Summons and Complaint is attached hereto as <u>Exhibit A</u>.

2.      In the Complaint, Toscana asserts claims against Schratter for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraud in the inducement and fraudulent conveyance.  <u>See</u> Ex. A, ¶¶43-64.

3.      In the Complaint, Toscana alleges that it is entitled to recover from Schratter receivables totaling over $500,000.  <u>See</u> Ex. A, ¶1.

4.      Schratter was served with copies of the Summons and the Complaint on December 26, 2017.  Prior to commencing the action in the Superior Court, on December 18, 2017, counsel for Toscana sent via email a copy of the unfiled Complaint to Schratter.

5.      Pursuant to 28 U.S.C. § 1446(a), the Complaint along with the following documents constitute all pleadings, process, and other documents that were served upon Schratter in this Action:

    a.   Proposed Order to Show Cause with Temporary Restraints (<u>see</u> Ex. B);

    b.   Brief in Support of Application for Order to Show Cause and Temporary Restraints (<u>see</u> Ex. C);

    c.   Certification of Victor J. Paparazzo (<u>see</u> Ex. D);

    d.   Letter dated January 3, 2018 to Hon. Barry P. Sarkasian (<u>see</u> Ex. E); and

    e.   Letter dated January 3, 2018 to the Clerk, Chancery Division, Hudson County Superior Court (<u>see</u> Ex. F).

6.      Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed with this Court within thirty (30) days of Schratter's receipt "through service or otherwise, of a

copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based."

7.     As demonstrated below, the case is properly removable pursuant to 28 U.S.C. §§ 1332 and 1441 because complete diversity of citizenship exists between Toscana and Schratter and the amount in controversy exceeds $75,000, exclusive of interest and costs.

## DIVERSITY JURISDICTION

8.     Under 28 U.S.C. §1332, a district court shall have original jurisdiction over a civil action when the matter in controversy exceeds the sum of Seventy Five Thousand and xx/100 Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different States.

Diversity of Citizenship

9.     Toscana is a New Jersey corporation, with its principal place of business located at 575 Winsor Drive, Secaucus, New Jersey. See Ex. A, ¶ 7. Toscana is therefore a citizen of New Jersey for purposes of 28 U.S.C. § 1332(a)(1).

10.     Schratter is a Delaware corporation with its principal place of business located at 11421 NW 107th Street, Suite 1, Miami, Florida. See Ex. A, ¶ 8. For purposes of determining diversity, a corporation is deemed to be a citizen of (1) any state where it is incorporated and (2) the state in which it has its principal place of business. See 28 U.S.C. § 1332(c)(1). Schratter is therefore a citizen of Delaware and Florida for purposes of 28 U.S.C. § 1332(a)(1).

11.     Because Toscana is deemed a citizen of New Jersey and Schratter is deemed a citizen of Delaware and Florida, complete diversity of citizenship exists between the parties in this Action.

Amount in Controversy

12.     The $75,000 amount in controversy requirement will go unsatisfied only when it "appear[s] to a legal certainty that the [plaintiffs'] claim is really for less than the jurisdictional amount." Suber v. Chrysler Corp., 104 F.3d 578, 583 (3d Cir. 1997) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938)). "[T]he question whether a plaintiff's claims pass the 'legal certainty' standard is a threshold matter that should involve the court in only minimal scrutiny of the plaintiff's claims." Id.

13.     The express language in paragraphs 1, 42 and 46 of the Complaint establishes that the amount in controversy in this Action exceeds $75,000.

14.     In paragraph 1 of the Complaint, Toscana alleges that it is seeking to recover from Schratter over $500,000.  See Ex. A, ¶1.

15.     In paragraph 42 of the Complaint, Toscana alleges that Schratter has failed to pay it $500,000.  See Ex. A., ¶42.

16.     In paragraph 46 of the Complaint, Toscana alleges that Schratter "presently owes Toscana in excess of $500,000 for cheese products."  See Ex. A., ¶46.

**ALL OTHER GROUNDS FOR REMOVAL ARE SATISFIED**

17.     Toscana's Complaint is properly removable to this Court pursuant to 28 U.S.C. § 1441.

18.     This case is a civil action within the meaning of the Acts of Congress relating to the removal of cases.

19.     Venue for removal is proper in this district and division under 28 U.S.C. § 1441(a) because this district and division embrace the Superior Court of New Jersey, Chancery Division, Hudson County, the forum in which the removed action was pending.

20.    In accordance with 28 U.S.C. § 1446(d), upon filing of this Notice of Removal, Schratter will give written notice of this Notice of Removal to Toscana. Schratter also will file a true and correct copy of this Notice of Removal with the Clerk of the Superior Court of New Jersey, Chancery Division, Hudson County.

WHEREFORE, defendant Schratter Foods, Inc. removes this action to the United States District Court for District of New Jersey.

Dated:  January 5, 2018

Respectfully submitted,

s/ Angelo A. Stio III
Angelo A. Stio III
**PEPPER HAMILTON LLP**
*(A Pennsylvania Limited Liability Partnership)*
Suite 400
301 Carnegie Center
Princeton, NJ 08540-6227
(609) 452-0808

Attorneys for Defendant Schratter Foods, Inc.

Of counsel:

H. Peter Haveles, Jr. (pro hac vice application to be submitted)
PEPPER HAMILTON LLP
620 Eighth Avenue, 37th Floor
New York, New York 10018
(212) 808-2700

Joel S. Magolnick (pro hac vice application to be submitted)
MARKO & MAGOLNICK, P.A.
3001 S.W. 3rd Avenue
Miami, Florida 33129
Office: (305) 285-2000

# EXHIBIT A

| | |
|---|---|
| Attorney(s): | James E. Tonrey, Jr., Esq. (Atty. ID #039821994) |
| | WILENTZ, GOLDMAN & SPITZER, P.A. |
| Address: | 90 Woodbridge Center Drive, P. O. Box 10 |
| | Woodbridge, New Jersey 07095 |
| Telephone No: | (732) 855-6199 |
| Fax No.: | (732) 726-6561 |
| Attorney(s)for Plaintiffs: | Toscana Cheese Co., Inc. |

-------------------------------------------------------X

TOSCANA CHEESE CO., INC.,

      Plaintiff,

v.

SCHRATTER FOODS, INC. d/b/a
ANCO FINE CHEESE, INC. and d/b/a
CORMAN SHIP SUPPLIES, INC.,
      Defendants.

-------------------------------------------------------X

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
HUDSON COUNTY
DOCKET NO. C-190-17

CIVIL ACTION

SUMMONS

From the State of New Jersey
To the Defendant(s) Named Above:  Schratter Foods, Inc. d/b/a Anco Fine Cheese, Inc. and d/b/a Corman Ship Supplies, Inc.

     The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey.  The complaint attached to this summons states the basis for this lawsuit.  If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it.  (The address of each deputy clerk of the Superior Court is provided.)  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971.  A filing fee* payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed.  You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above.  A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

     If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit.  If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

     If you cannot afford an attorney, you may call the Legal Services office in the county where you live.  A list of these offices is provided.  If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.  A list of these numbers is also provided.

Dated: December 26, 2017

          /s/Michelle M. Smith
          Michelle M. Smith, Superior Court Clerk

Name of Defendant to be Served:  Schratter Foods Inc. d/b/a Anco Fine Cheese, Inc., Corman Ship Supplies, Inc.
Address of Defendant to be Served:  EPGD Attorneys at Law, P.A., 2701 Ponce de Leon Blvd., Ste. 202, Coral Gables, Florida 33134

*$175 FOR CHANCERY DIVISION CASES OR $175 FOR LAW DIVISION CASES
31 Summons – Law or Chancery Divisions
Superior Court – Appendix XII-A

#9656787.1

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08401
LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court
Case Processing Section
Room 119
Justice Center, 10 Main St.
Hackensack, NJ 07601-0769
LAWYER REFERRAL
(201) 488-0044
LEGAL SERVICES
(201) 487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
Attn.: Judicial Intake
First Fl., Courts Facility
49 Rancocas Rd.
Mt. Holly, NJ 08606
LAWYER REFERRAL
(609) 261-4862
LEGAL SERVCIES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court
Civil Processing Office
1st Fl., Hall of Records
101 S. Fifth St.
Camden, NJ 08103-4001
LAWYER REFERRAL
(609) 964-4520
LEGAL SERVICES
(609) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court
Central Processing Office
9 N. Main St.
Box DN-209
Cape May Court House, NJ 08210
LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Broad & Fayette Sts., P.O. Box 615
Bridgeton, NJ 08302
LAWYER REFERRAL
(609) 692-6207
LEGAL SERVICES
(609) 451-0003

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court
237 Hall of Records
465 Dr. Martin Luther King, Jr. Blvd.
Newark, NJ 07102
LAWYER REFERRAL
(973) 622-6207
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court
Civil Case Management Office
Attn.: Intake
Court House
1 North Broad Street, P.O. Box 129
Woodbury, NJ 08096
LAWYER REFERRAL
(609) 848-4589
LEGAL SERVICES
(609) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court
Superior Court, Civil Records Dept.
Brennan Court House – 1st Floor
583 Newark Ave.
Jersey City, NJ 07306
LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 798-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
65 Park Avenue
Flemington, NJ 088822
LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court
Local Filing Office, Courthouse
175 S. Broad St., P.O. Box 8068
Trenton, NJ 08650
LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court
Administration Building
Third Floor
1 Kennedy Square, P.O. Box 2633
New Brunswick, NJ 08903-2633
LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MONMOUTH COUNTY:**
Deputy Clerk of the Superior Court
71 Monument Park
P.O. Box 1262
Court House, West Wing
Freehold, NJ 07728-1262
LAWYER REFERRAL
(732) 431-5544
LEGAL SERVICES
(732) 866-0020

**MORRIS COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Administration & Records Building
P.O. Box 910
Morristown, NJ 07963-0910
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court
Court House, Room 119
118 Washington Street
Toms River, NJ 08754
LAYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court
Civil Division
Court House
77 Hamilton St.
Paterson, NJ 07505
LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 345-7171

**SALEM COUNTY:**
Deputy Clerk of the Superior Court
92 Market St., P.O. Box 18
Salem, NJ 08079
LAWYER REFERRAL
(609) 935-5629
LEGAL SERVICES
(609) 451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
New Court House, 3rd Fl.
P.O. Box 3000
Somerville, NJ 08876
LAWYERS REFERRAL
(963) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court
Sussex County Judicial Center
43-47 High Street
Newton, NJ 07860
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 383-7400

**UNION COUNTY:**
Deputy Clerk of the Superior Court
1st Fl., Court House
2 Broad Street
Elizabeth, NJ 07207-6073
LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court
Civil Division Office
Court House
413 Second Street
Belvidere, NJ 07823-1500
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(908) 475-2010

RECEIVED

DEC 2 8 2017

SUPERIOR COURT OF NEW JERSEY
COUNTY OF HUDSON
CHANCERY DIVISION # 2

James E. Tonrey, Jr. (Atty Id. No. 039821994)
WILENTZ, GOLDMAN & SPITZER P.A.
Attorneys at Law
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095
(732) 636-8000
Attorneys for Plaintiff
Toscana Cheese Co., Inc.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
HUDSON COUNTY
DOCKET NO.: C- 190-17

---

-------------------------------------------------X

TOSCANA CHEESE CO., INC.,

        Plaintiff,

v.

SCHRATTER FOODS, INC. d/b/a ANCO
FINE CHEESE, INC. and d/b/a
CORMAN SHIP SUPPLIES, INC.,

        Defendants.

-------------------------------------------------X

Civil Action

**COMPLAINT**

Toscana Cheese Company, Inc. ("Toscana") as and for its Complaint against

Schratter Foods, Inc. d/b/a ANCO Fine Cheese, Inc. ("ANCO") and d/b/a Corman Ship Supplies

("Corman") (hereinafter, together, "ANCO" unless stated otherwise) by and through its

undersigned attorneys, states and alleges as follows.

## NATURE OF THE ACTION

1.    This is a lawsuit whereby Toscana seeks payment in full of over $500,000

("the Receivable") ANCO owes for cheese products (and packaging) delivered to and accepted

by ANCO.

2.    ANCO does not dispute it is liable for the entire Receivable. To the

contrary, ANCO has repeatedly promised Toscana that the entire Receivable will be paid in full.

#9653552.1

Yet, the dates by which ANCO promised to perform have come and gone, without performance by ANCO, leaving the Receivable unpaid.

3.      Toscana recently learned ANCO is planning to engage in a sale of its assets whereby a third party will purchase ANCO's assets, leaving ANCO an empty shell corporation, while the equity holders walk away with the payment for their shares of ANCO, and leaving Toscana (and, upon information and belief all other trade creditors of ANCO) with no ability to collect what it is owed.

4.      By way of this lawsuit, Toscana is asserting claims of breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraudulent inducement and fraudulent conveyance.  Toscana seeks an award of damages, as well as the imposition of a constructive trust on funds ANCO obtains as a result of its sale of its assets, in an amount sufficient to pay the Receivable and all related costs, as well as further related relief.

## JURISDICTION

5.      This Court has personal jurisdiction over Defendants given their purposeful, intentional contacts with the State of New Jersey to order cheese and specialty cheese products from Toscana in New Jersey, the cheese and specialty cheese products were to be manufactured in New Jersey at Toscana's facility, the products were picked up at Toscana's facility in New Jersey by Defendants and the present lawsuit arises directly out of Defendants' contacts with the State of New Jersey.

6.      Venue is appropriate in the Superior Court of New Jersey, Hudson County given that Toscana is located in Hudson County, New Jersey, and a substantial part of the conduct underlying this lawsuit occurred in Hudson County.

#9653552.1                                    2

## FACTUAL BACKGROUND

### A.   The Parties

7.     Toscana is a corporation of the State of New Jersey, with an office located at 575 Winsor Drive, Secaucus, NJ 07094. Toscana is involved in the manufacturing, sale and distribution of cheese products.

8.     Schratter is a corporation of the State of Delaware with an office located at 11421 NW 107th Street, Suite 1, Miami Florida 33178.  Schratter is in the cheese processing business. Prior to relocating to Florida within approximately the last year, Schratter had its principal office located in Fairfield, New Jersey.

9.     Anco is a division of Schratter, and is the trade name under which Schratter imports and sells cheese products and specialty cheese products.  Anco's address is 11421 NW 107th Street, Suite 1, Miami Florida 33178.  Prior to relocating to Florida within approximately the last year, Anco conducted its business in Fairfield, New Jersey and Moonachie, New Jersey.

10.     Corman is also a division of Schratter and is the entity through which Schratter conducts its ship chandling business (i.e., supplies luxury cruise ships with cheese products). Prior to relocating to Florida within approximately the last year, Corman conducted its business in Fairfield, New Jersey and Moonachie, New Jersey.

### B.   ANCO Has Purchased Cheese Products From Toscana For Many Years

11.     Since at least the year 2001, ANCO  (meaning ANCO and Corman, as indicated above) located in New Jersey, has purchased cheese products from Toscana's headquarters in New Jersey and have resold those cheese products to various customers across the United States.

12.     To obtain the cheese products it needs, the process ANCO has followed for many years is that it places an order with Toscana, following which Toscana prepared at its cheese

manufacturing facility in New Jersey the cheese product ANCO ordered, packaged it, and delivered the product to ANCO facility in New Jersey or ANCO picked up those products at Toscana's facility in New Jersey. Since ANCO moved its facility to Florida, the process remains the same, with ANCO ordering product from Toscana in New Jersey, Toscana making the product in New Jersey, and Toscana then delivering the product to ANCO, or ANCO having the goods picked up from Toscana's facility in New Jersey.

13.     To obtain payment from ANCO for the cheese products, Toscana issues invoices to ANCO, the terms of which require payment  within thirty days of delivery of the cheese product.

**C.     The Parties' Agreements**

14.     Toscana and ANCO entered into a series of written contractual agreements over the years. Typically, after the 5 year term of the agreements expired, the parties would simply renew the preexisting agreement.

15.     On or about January 1, 2017, Toscana provided a new form of agreement ("the Agreement") to ANCO (and its related companies, Schratter t) and Corman ). ANCO, Schratter and Corman executed the Agreement.

16.     Pursuant to the Agreement, ANCO agreed to purchase from Toscana its requirements for Mozzarella Products intended to bear a label owned by ANCO. Agreement, ¶ 1.1(2).

17.     Toscana agreed to provide ANCO with the mozzarella products at such times and in such quantities as set forth in ANCO's purchase orders.

18.     In fulfilling ANCO's purchase orders, Toscana duly provided ANCO with invoices, requiring payment in full within thirty days of the date thereof.

**D.     ANCO Ceased Paying For Goods Delivered By Toscana And Accepted By ANCO**

19.     ANCO ordered certain cheese products from Toscana in mid-2017. To purchase those products, ANCO contacted Toscana in New Jersey, just as it had always done in the past, requested Toscana in New Jersey to manufacture the cheese being ordered, and either had Toscana deliver the cheese products to ANCO's facility in Florida or itself picked up the cheese products at Toscana's facility.

20.     Toscana duly supplied ANCO with the cheese products ANCO ordered. The deliveries to ANCO conformed in all respects with the orders by ANCO. At no time did ANCO reject cheese products supplied by Toscana or otherwise object to the products supplied by Toscana.

21.     Toscana produced in New Jersey the products ANCO ordered. While ANCO was obligated to pay for those products no later than thirty days following delivery, ANCO failed and refused to pay Toscana's invoices.

22.     Toscana continued to supply product to ANCO in light of the parties' long relationship, and reasonable belief that ANCO would pay the invoice, if not immediately, then within thirty days thereof.

23.     When ANCO did not pay the Toscana's invoices within sixty days of issuance, Toscana inquired as to when the payment would be made. ANCO assured Toscana the payment would be forthcoming and requested that Toscana continue to ship products in accordance with ANCO's purchase orders.

24.     Despite Toscana's deliveries to ANCO in accordance with its purchase orders, ANCO did not pay the August 25, 2017 invoice, or invoices that were subsequently issued, based on ANCO's assurances that such payments would be forthcoming.

25.     This course of events continued for September and October, 2017.  In response to Toscana's requests for payment, ANCO would assure that payments would be made, while advising that it needed Toscana's cheese products to be delivered in order to generate the funds needed to pay Toscana.  Toscana, induced by ANCO's assurances, continued to supply product to ANCO.

**E.     Toscana's President Meets With ANCO's Management On Two Separate Occasions To Address ANCO's Failure/Refusal To Pay The Outstanding Invoices**

26.     With ANCO's receivable growing on almost a daily basis and with Toscana continuing to receive purchase orders from ANCO, Toscana's President, Victor Paparazzo, arranged a meeting with ANCO's management to discuss a plan to address ANCO's growing receivable to Toscana.

27.     Mr. Paparazzo met with ANCO in or about November, 2017.  ANCO did not deny or dispute the Receivable or any portion thereof.  Rather, ANCO advised Mr. Paparazzo that it needed Toscana to continue delivering product so that it could generate funds to pay Toscana.  ANCO assured Mr. Paparazzo the Receivable would be paid in full.

28.     Toscana agreed to continue supplying product to ANCO, provided, however, ANCO paid in full for the product being delivered, and provided an additional payment of $25,000 or more was made to address the receivable.  In such manner, Toscana sought to keep the Receivable from growing, while at the same time addressing the Receivable at least in part.

29.     Subsequent to that meeting, ANCO made a payment to cover product it was ordering but did not also make any payments to address the Receivable.  Yet, ANCO continued to submit purchase orders to Toscana, requesting that it begin the process of cheese-making so that ANCO could resell the products.

30.    Mr. Paparazzo advised ANCO Toscana would not accept any further purchase orders from ANCO and scheduled to meet with ANCO's management yet again to further discuss and address the Receivable.

**F.    ANCO Agrees To Pay The Entire Receivable By On Or About January 12, 2018 Through Two Separate Lump Payments**

31.    The second meeting between ANCO and Mr. Paparazzo occurred in or about December, 2017.  With respect to ANCO's continued inability to pay down the Receivable, ANCO claimed it was having difficulties with its lender.  According to ANCO, its financing arrangement with its lender required all payments to be placed in a lockbox to be provided to the lender.  The lender exercised control over how much of the cash flow it would keep, and how much ANCO would be permitted to use.  ANCO claimed the lender was not permitting it access to enough funds to pay the Receivable.

32.    ANCO provided yet an additional proposal to Toscana to address the Receivable. ANCO explained it was anticipating a payment from an investor to purchase shares in a company related to ANCO, Cognati Cheese Co., which would result in ANCO receiving $300,000 ("the Cognati transaction").  ANCO represented to Mr. Paparazzo that the Cognati Transaction would close during the week of December 11, 2017 and that Toscana would be paid one half of the proceeds from that transaction, $150,000 during the week of December 18, 2017.

33.    ANCO also represented that it expected to be acquired by a third party ("the Sale of the Company Transaction"), and that it would pay the remaining Receivable (which would be approximately $350,000 if the payment from the Cognati Transaction was made to Toscana) from the proceeds from the Sale of the Company transaction.  ANCO claimed the closing of that transaction would take place on January 12, 2018.

34.     By letter dated December 18, 2017, Toscana, through counsel, confirmed the terms of the foregoing agreement.

**G.      ANCO Fails To Make Any Payment From The Cognati Transaction And Issues A Letter To Its Vendors (Including Toscana) That It Would Be Acquired Through A Purchase Of Its Assets**

35.     ANCO did not proceed with the Cognati transaction and did not make any payment to Toscana, let alone the $150,000 payment it promised to make from the proceeds of that transaction.

36.     Upon inquiry by Mr. Paparazzo, ANCO claimed the putative purchaser of the Cognati shares would not advance payment for the shares because ANCO owed him more money from other transactions than he would have been required to pay for the shares. Upon information and belief, ANCO refused to proceed with the Cognati transaction unless the putative purchaser advanced additional cash for the purchase of the shares. Rather than proceed with the transaction by providing the putative purchaser with the Cognati shares in return for a forgiveness of $300,000 of the debt it owed the putative purchaser, ANCO elected not to proceed with the transaction.

37.     ANCO subsequently issued to Toscana a letter/notice from its parent, Schratter Foods, Inc. The letter was addressed to ANCO's "partner" and announced that Schratter was selling the assets that "are used in the connection with their Anco and Corman Divisions." The letter did not advise Toscana what would happen with the Receivable, or whether it would be paid. Indeed, contrary to the oral agreement Mr. Paparazzo had with ANCO that the balance of the Receivable would be paid at the closing of the transaction whereby ANCO was sold to a third party, the letter did not address whether or how Toscana would be paid as part of the sale transaction.

38.     Despite characterizing Toscana's support (and the support of ANCO's other vendors) as "the biggest asset of the Company," the letter in essence announces that ANCO would be cannibalized by way of its assets being sold, with no provision being put in place to pay ANCO's trade debts to its vendors, including Toscana.

39.     Thus, notwithstanding Toscana's efforts to preserve the relationship and to obtain payment for the goods indisputably delivered to and accepted by ANCO, it now appears that ANCO may proceed with the sale of its assets and not make any payment to Toscana.

40.     While Toscana struggles to remain in business, the equity holders in ANCO will be permitted to sell their shares in ANCO and walk away from the debts of the business.

41.     The Court should not permit ANCO and/or its principals to proceed in such matter.

42.     As a direct and proximate result of the foregoing, Toscana will suffer irreparable harm.   As a small company, a loss of $500,000 based on ANCO's failure to pay will be disastrous to Toscana and may cause it to cease operations.   Indeed, with such a large receivable, and no prospect for payment, Toscana's lenders may freeze lending to Toscana and cripple its ability to continue as a going concern.   Further, given that the assets of ANCO/Corman will be purchased by a third party in the near future, leaving Anco/Corman as a shell, Toscana will likely not obtain any further payment from ANCO following the sale to the third party.

## COUNT ONE

### (Breach of Contract)

43.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

44.     ANCO placed purchase orders with Toscana for the delivery of cheese products.

#9653552.1                                                              9

45.     Toscana fulfilled those purchase orders in accordance with the Supply Agreement, and duly issued invoices for the cheese products delivered to and accepted by ANCO. The invoices required payment within thirty days of delivery.

46.     ANCO breached the supply agreement by failing and refusing to make payment of Toscana's invoices beginning in August, 2017 and continuing through December, 2017, and ANCO presently owes Toscana in excess of $500,000 for cheese products delivered to and accepted by ANCO.

47.     As a direct and proximate result of the foregoing, Toscana has suffered substantial damages.

## COUNT TWO

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

48.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

49.     There is implied in every agreement in the state of New Jersey a covenant of good faith and fair dealing

50.     The conduct by ANCO in denying Toscana the benefits of the Supply Agreement constitutes a breach of the implied covenant of good faith and fair dealing.

51.     As a direct and proximate result thereof, Toscana has suffered damages.

## COUNT THREE

### (Unjust Enrichment)

52.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

53.     By failing to pay for the cheese products shipped to and accepted by ANCO, without paying for such cheese products, ANCO has received unjust enrichment at the expense of Toscana.

54.     As a direct and proximate result of the foregoing, Toscana has suffered damages.

## COUNT FOUR

### (Fraudulent Inducement)

55.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     During the meetings with ANCO's representatives, ANCO represented, through its employees, agents, and/or managers/owners that Toscana would be paid the entirety of the Receivable.

57.     At the time those representations were made, they were knowingly false, and made to induce Toscana into continuing to supply product to ANCO.

58.     As a result of relying on the representations of ANCO, Toscana shipped additional products to ANCO, thereby increasing the amount of the receivable.

59.     ANCO did not have and does not have the funds to pay the Receivable. Toscana has suffered damages as a result of the knowingly false representations made by ANCO through its agents, and reliance on such representations in shipping product to ANCO.

60.     As a direct and proximate result of the foregoing, Toscana has suffered damages.

## COUNT FIVE

### (Fraudulent Conveyance)

61.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

62.     The assets of ANCO are being sold to a third party purchaser with actual intent to hinder, delay or defraud Toscana from collecting the Receivable.

63.     The actual intent of ANCO to hinder, delay or defraud Toscana is demonstrated by the fact that insiders of ANCO, the officer/director equity holders, are retaining the value of ANCO's assets, i.e., cash, following the transaction; ANCO was sued or threatened with suit prior to the transaction; the transfer is for substantially all of ANCO's assets, and the sale of ANCO's assets occurred shortly after ANCO incurred a substantial debt to Toscana.

64.     Toscana, a creditor of the debtor, ANCO, has, and will continue to suffer substantial damages in the event ANCO is permitted to distribute to the equity holders of the Company the funds obtained from the sale of ANCO's assets.

WHEREFORE, Toscana demands judgment against ANCO on all counts of this complaint as follows:

a.     Awarding compensatory damages;

b.     Awarding consequential damages;

c.     Awarding incidental damages, including prejudgment interest;

d.     Enjoining and requiring ANCO to place all funds received from the sale of its assets into an Escrow Account,

e.     Enjoining ANCO from dissipating any of the funds received from the sale of its assets;

f.     Imposing a constructive trust in an amount equivalent to the Receivable on the funds ANCO receives from sale of its assets;

g.     Awarding attorneys fees and costs of suit;

h.     Awarding such other and further relief as the Court deems appropriate.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, James E. Tonrey, Jr. is hereby designated as trial counsel.

## CERTIFICATION PURSUANT TO RULE 4:5-1

I certify that, to the best of my knowledge, information and belief, that the matter in controversy herein is not the subject of any other proceeding pending in any court of any pending arbitration proceeding, that no other action or arbitration is contemplated, and that I am aware of no other party that should be joined in this action.

## RULE 4:5-1(b)(c) CERTIFICATION

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

DATED: December 22, 2017

WILENTZ, GOLDMAN & SPITZER, P.A.

BY: _James E. Tonrey_

JAMES E. TONREY JR.

#9653552.1                                    13

# EXHIBIT B

```
-------------------------------------------X
                                           :
TOSCANA CHEESE CO., INC.,                  :
                                           :
            Plaintiff,                     :
                                           :
v.                                         :
                                           :
SCHRATTER FOODS, INC. d/b/a ANCO           :
FINE CHEESE, INC. and d/b/a                :
CORMAN SHIP SUPPLIES, INC.,                :
                                           :
            Defendants.                    :
                                           :
-------------------------------------------X
```

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
HUDSON COUNTY
DOCKET NO.: C-190-17


CIVIL ACTION

---

## BRIEF ON BEHALF OF PLAINTIFF TOSCANA CHEESE CO., INC. IN SUPPORT OF ITS APPLICATION FOR ENTRY OF AN ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINTS

---

WILENTZ, GOLDMAN & SPITZER
Attorneys at Law
90 Woodbridge Center Drive
Post Office Box 10
Woodbridge, New Jersey 07095
(732) 636-8000
Attorneys for Plaintiff
Toscana Cheese Co., Inc.

Of Counsel and On the Brief:
    JAMES E. TONREY, JR., ESQ.

## PRELIMINARY STATEMENT

Plaintiff, Toscana Cheese Co., Inc. ("Toscana") submits this brief, together with the Certification of Victor J. Paparazzo, dated January 3, 2018 ("Paparazzo Cert.") in support of its application for the entry of an Order to Show Cause with temporary restraints, enjoining and restraining Defendant Schratter Foods, Inc. d/b/a ANCO Fine Cheese, Inc. and Corman Ship Supplies, Inc. (together, "ANCO") from disbursing $582,201.95 (the "Toscana Receivable") of the funds received from the sale of ANCO's assets to a third party, and requiring ANCO to place those funds in an interest bearing escrow account for the benefit of Toscana pending the conclusion of this matter.

This is a lawsuit in which ANCO ordered and accepted delivery of over $500,000 in cheese products from Toscana, but has failed and refused to pay for those products. Despite repeatedly promising Toscana it would pay the Toscana Receivable in full, ANCO has breached each and every promise it made concerning such payment. Recently, in response to a letter from Toscana's counsel confirming the terms of ANCO's latest agreement to pay the Toscana Receivable, ANCO provided Toscana with a form letter announcing that ANCO is planning to sell its assets to a third party in a deal expected to close on January 12, 2018, and which made no mention of payment of the Toscana Receivable, let alone a plan or process to accomplish such payment. In the event ANCO sells its assets to a third party, leaving ANCO no more than a shell entity with no assets, the Toscana Receivable will not be paid, and Toscana may be left with no party from whom collection may be made.

Toscana is now applying to this Court for an Order to Show Cause, setting the matter down for a hearing on a preliminary injunction, with temporary restraints. Without this Court's intervention and restraints imposed on ANCO from dissipating funds received from the sale of its assets, ANCO's assets will be sold, ANCO will be judgment proof, and Toscana will be left to

litigate the question of whether ANCO's successor is liable for the Toscana Receivable. Yet, there is not a shred of doubt that ANCO is liable to Toscana for the cheese and cheese products specially manufactured in New Jersey for ANCO, delivered to ANCO and/or its customers, accepted by ANCO and for which, upon information and belief, ANCO has been paid through resale of the products.

As explained in further detail below, Toscana meets all the elements for issuance of the requested Restraints. There is a reasonable probability of success on Toscana's claims of breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement and unjust enrichment claims. Indeed, there is no question ANCO ordered nearly $600,000 worth of cheese and cheese products from Toscana, accepted those products in their entirety without complaint or rejection of any such products, did not pay for those products within the thirty day terms applicable thereto, and induced Toscana to continue shipping products to it based on false representations that ANCO would pay for those products as long as Toscana continued to manufacture the cheese ANCO ordered. These representations were false when made and were made knowing Toscana would rely upon them, and to induce Toscana to continue providing product, while knowing that ANCO could not or would not pay Toscana for such products. In light of these facts, there is a substantial probability Toscana will prevail on the merits of its breach of contract, breach of the implied covenant, unjust enrichment and fraudulent inducement claims.

Additionally, there is a substantial probability Toscana will prevail on the merits of its fraudulent conveyance claim against ANCO. Toscana claims that ANCO's forthcoming sale of its assets (in a transaction scheduled to close on January 12, 2018) to a third party purchaser constitutes a fraudulent transaction as to Toscana because the effect of the transaction will be to place ANCO's assets beyond the reach of its creditors. Given the undisputed facts underlying

this claim, there is a substantial probability Toscana will prevail on the merits of this claim. Indeed, as explained in further detail below, the transfer being contemplated by ANCO is occurring at a time when it has recently incurred a substantial debt to Toscana, it is proposing to sell all of its assets and the insiders of the company, i.e., the company "insiders," will receive cash in exchange for selling their interests in the company, while it appears there has been no provision for payment of the Toscana Receivable. As set forth in New Jersey's Fraudulent Conveyance statute, the proposed transaction implicates several of the "badges of fraud" enumerated by the statute as tell-tale signs of an actual intent to defraud. While the caselaw provides that facts meeting even one of the badges of fraud may suffice for purposes of finding an actual intent to defraud, the fact that several such badges are implicated by ANCO's conduct creates a very strong inference the transaction has been perpetrated with actual fraudulent intent and constitutes a fraudulent conveyance, entitling Toscana to the relief provided pursuant to the statute, including but not limited to establishing a constructive trust over that portion of the purchase price amounting to the Toscana Receivable plus interests.

Nor can there be any question that, absent this Court's intervention, Toscana will suffer irreparable harm. In the event the sale of ANCO's assets proceed on January 12, 2018, without this Court entering the Restraints, ANCO will be left as an empty shell. Even if ANCO fully admits it is liable to Toscana, it simply will not have the funds to pay any such judgment. In these circumstances, Toscana will have no party to collect from and will suffer irreparable harm. Indeed, losing the ability to collect nearly $600,000 from ANCO is likely to cripple and/or destroy Toscana as an ongoing business. As a small business in the State of New Jersey, Toscana does not have endless resources or the ability to continue conducting its business after suffering such a large loss. Moreover, with nearly $600,000 in receivables from one customer more than 90 days past due, Toscana will likely face significant scrutiny and/or a permanent

3

freezing of its credit line from its lender.  Without the ability to draw on that credit line to fund ongoing business, it is likely Toscana will not be able to continue functioning.  Plainly, the destruction of Toscana's business constitutes irreparable harm.

Further, in circumstances nearly identical to the circumstances presently at issue here, Courts have found the irreparable harm element to be met, as a matter of law.  To illustrate, the Court in Seide v. Crest Color, Inc., et al., 835 F. Supp. 732, 735-36 (S.D.N.Y. 1993) had before it a matter in which the defendant, Crest Color, Inc. ("Crest") and a related company Daron Printing Corp. owed certain payments to employee benefit plans.  Crest notified the union President that it intended to sell its remaining assets.  The union president applied to the Court to enjoin the sale of Crest, Daron and all or substantially all of the assets of both companies.  The Court found all of the elements for issuance of an injunction to be satisfied and entered an injunction *enjoining the sale of the companies' assets without Plaintiff's consent and/or requiring defendants to place the proceeds from any sale of assets to be deposited into an escrow account.*

With respect to the irreparable harm element, the Court rejected the Defendants' argument that money damages would suffice, finding that such argument ignores the well settled fact that injunctions are proper to prevent a defendant from making a judgment uncollectible:

> Defendants argue that because the ultimate remedy Plaintiff seeks is money damages, injunctive relief is inappropriate.  This argument is unsupported by an attentive reading of the case law. Defendants conflate the issues of whether a harm may be *monetized* and whether a money *judgment* standing by itself will be sufficient to provide a movant with relief.  As courts have made clear, while "as a general rule . . . a party may not obtain injunctive relief where it is claiming a loss that can be adequately remedied by an award of money damages, **preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible.**" (Id. at 735) (underlining and boldface added).

4

Just as the Court in Seide found the irreparable harm element to be satisfied by conduct by the defendant – the asset sale – that threatened to prevent collection of the debt due Plaintiff, this Court should find the irreparable harm element to be satisfied here, where the conduct of ANCO in selling its assets may prevent Toscana from collecting on any judgment that may be entered.

The balance of the equities also plainly favors Toscana. As explained in further detail below, Toscana has supplied cheese products to ANCO for many years. It is ANCO that recently ordered nearly $600,000 in products from Toscana, and who has agreed to pay Toscana for such products. In accordance with ANCO's orders, Toscana dutifully manufactured the products and had them delivered to ANCO, which ANCO fully and unconditionally accepted. Yet, ANCO is now failing and refusing to pay for those cheese products, in an amount of approximately $500,000. To require ANCO to pay for the goods it ordered and accepted is not unfair to ANCO; it merely requires ANCO to pay for benefits it has already received.

Lastly, the public interest also favors issuance of an injunction in favor of Toscana. Toscana is a viable, important employer in Secaucus, New Jersey. It pays its share of taxes and employs a significant number of New Jersey residents in its office and plant. ANCO's conduct in not paying for the $500,000 in cheese/cheese products it received from Toscana is compromising Toscana's ability to conduct its business, and may constitute a mortal, or near-mortal wound to Toscana's ability to continue as a going concern (if Toscana's lenders freeze its credit facility or terminate the financing arrangement based on the amount of receivables over 90 days past due). Given this, entering the requested temporary restraints and preserving Toscana's ability to collect the monies due to it from ANCO is plainly in the public interest.

For all the foregoing reasons, we respectfully request the Court to enter the requested Order, temporarily restrain ANCO from dissipating the funds received from the sale of its assets

5

and require ANCO to place any such money into an interest bearing escrow account in favor of Toscana.

## STATEMENT OF FACTS[1]

**A.      Background**

Toscana is a corporation of the State of New Jersey.  It is located in Secaucus, New Jersey, where it maintains its administrative office and manufacturing facility.  Toscana employs approximately 100 persons at its offices and plant.

As part of its operations, Toscana manufactures cheese for its customers 5 or 6 days per week.  In doing so, it purchases 1.5 million pounds of milk per week for its plant from third party suppliers and ships its cheese products to many different customers across the United States.

Toscana also packages the cheese products ordered by its customers for resale to third party purchasers.  In accordance with its customers' specifications, Toscana orders custom made packaging materials specifically tailored to the customers' specifications, and packs the cheese products with such packaging prior to shipment to the customer.

While Toscana strives to increase its production on a yearly basis by increasing its customer base, it is not a large-scale supplier to large supermarket chains or restaurants.  Rather, Toscana is a relatively small business, with a concentration of customers in the private label cheese business, meaning that Toscana manufactures cheese for third party suppliers who sell Toscana's cheese under their own private label/brands.

---

[1] The Statement of Facts is directly drawn from the Certification of Victor J. Paparazzo, dated January 3, 2018, being filed and served herewith.

6

**B.**   **Toscana's Relationship With ANCO And The Standardized**
**Cheese Ordering/Manufacturing That Has Developed**

Toscana has been selling cheese to ANCO Fine Cheese ("ANCO") and Corman Ship Supplies ("Corman") for approximately 20 years. ANCO is a wholesale cheese distributor and Corman is a ship chandler, i.e., an entity that supplies products to luxury cruise ships. Both ANCO and Corman obtain their cheese products from Toscana.

The way the production and supply relationship between Toscana and ANCO/Corman proceeds has, over the years, become standardized. ANCO and/or Corman contact Toscana to manufacture quantities of cheese at Toscana's manufacturing plant in Secaucus. In response to the orders from ANCO and/or Corman, Toscana orders the milk necessary to make the cheese and begins the process at its plant of actually making the cheese. The milk for the production is ordered from third party suppliers and kept in large silos at Toscana's plant, capable of holding 15,000 – 50,000 gallons of milk for short term storage during the cheese manufacturing process. Given the limited shelf life of milk and by-products of milk such as cheese/cheese products, Toscana is unable to make cheese to be kept in stock or storage, but instead must make its cheese in response to specific orders.

At Toscana's plant, the cheese making process requires the heating of milk and the creation of milk curd, the testing of the cheese product by qualified food testing analysts on Toscana's staff, and, among other things, the carting away of waste and cleaning of Toscana's heavy machinery in accordance with health and safety standards promulgated by the FDA. The disposal-of-waste process in the State of New Jersey, and in particular in Secaucus, involves monitoring of the "whey" by-product of the cheese making process, given that such whey may not be disposed through domestic sewer service (the Secaucus Municipal Utilities Authority will not permit such disposal in light of the high CBOD(5) count of such waste), as well as

7

monitoring the amount of TSS (total suspended solids) and whether the refuse is too acidic or basic. This testing is done by qualified professionals on Toscana's staff, as well as by officials from the SMUA, which monitors Toscana's output in light of the damage or strain that could result to SMUA's sewage facility if CBOD(5), TSS and acidic/basic water exceeds permissible levels.

To alleviate issues with "whey" in Toscana's sewage, Toscana separates the whey from its waste stream, and has it carted off-site in large tanker-trucks supplied by New Jersey businesses, to be used by pig farmers in the State of New Jersey.

In addition to the cheese making process, the process of making cheese for ANCO also involves packaging the final product at Toscana's Secaucus Plant. Packaging the products for ANCO requires Toscana to order and pay for the packaging products in the State of New Jersey and to store those packaging products for eventual use. Toscana is leasing storage space in Cliffside Park, New Jersey specifically to store cheese packaging products such as that used for ANCO.

Following the packaging of the cheese ordered by ANCO, Toscana would then deliver the cheese to ANCO at its facilities in New Jersey, and then in Florida.

C.    **ANCO's Recent Failure To Pay Toscana's Invoices**

Until recently, ANCO regularly ordered cheese products from Toscana, and paid Toscana within terms or nearly within terms. Toscana's invoices typically provide thirty days to pay for the cheese product being delivered to the customer.

Upon information and belief, however, the ownership of Schratter has changed. With that change in ownership came a change in the regularity of payments for goods Toscana produced and provided to ANCO or Corman. Despite Toscana's sales to ANCO, and the

8

reselling of that cheese through ANCO and/or Corman, Schratter claimed it did not have enough funds to pay Toscana's invoices within the thirty day terms set forth in those invoices.

Toscana continued to supply product to ANCO in light of the parties' long relationship, and reasonable belief that ANCO would pay the invoice, if not immediately, then within thirty days thereof.

When ANCO did not pay the Toscana's invoices within sixty days of issuance, Toscana inquired as to when the payment would be made. ANCO assured Toscana the payment would be forthcoming and requested that Toscana continue to ship products in accordance with ANCO's purchase orders.

Despite Toscana's deliveries to ANCO in accordance with its purchase orders, ANCO did not pay the August 25, 2017 invoice, or invoices that were subsequently issued, based on ANCO's assurances that such payments would be forthcoming.

This course of events continued for September and October, 2017. In response to Toscana's requests for payment, ANCO, through its principals Arno Leoni and Claude Balden would assure that payments would be made, while advising that it needed Toscana's cheese products to be delivered in order to generate the funds needed to pay Toscana. Toscana, induced by ANCO's assurances, continued to supply product to ANCO.

**D. Toscana Has Met With ANCO's Management On Two Separate Occasions To Address ANCO's Failure/Refusal To Pay The Outstanding Invoices**

With ANCO's receivable growing on almost a daily basis, and with Toscana continuing to receive purchase orders from ANCO, Toscana's president, Victor Paparazzo, arranged a meeting with ANCO's management, Messrs. Balden and Leoni to discuss a plan to address ANCO's growing receivable to Toscana.

#9664119.1(154375.006)

Mr. Paparazzo met with Messrs. Balden and Leoni in or about November, 2017. They, on behalf of ANCO did not deny or dispute the Receivable or any portion thereof. Rather, they advised Mr. Paparazzo that ANCO needed Toscana to continue delivering product so that it could generate funds to pay Toscana. Messrs. Balden and Leoni assured Mr. Paparazzo the Receivable would be paid in full.

Toscana agreed to continue supplying product to ANCO, provided, however, ANCO paid in full for the product being delivered, and provided an additional payment of $25,000 or more was made to address the receivable. In such manner, Toscana sought to keep the Receivable from growing, while at the same time addressing the Receivable at least in part.

Subsequent to that meeting, ANCO made a payment to cover product it was ordering but did not also make any payments to address the Receivable. Yet, ANCO continued to submit purchase orders to Toscana, requesting that it begin the process of cheese-making so that ANCO could resell the products.

Mr. Paparazzo advised ANCO that Toscana would not accept any further purchase orders from ANCO and scheduled to meet with Messrs. Balden and Leoni yet again to further discuss and address the Receivable.

     **E.**     **ANCO Agrees To Pay The Entire Receivable By On Or About January 12, 2018 Through Two Separate Lump Payments**

Mr. Paparazzo had a second meeting with Messrs. Balden and Leoni in or about December, 2017. With respect to ANCO's continued inability to pay down the Receivable, ANCO claimed it was having difficulties with its lender. According to ANCO, its financing arrangement with its lender required all payments to be placed in a lockbox to be provided to the lender. The lender exercised control over how much of the cash flow it would keep, and how

much ANCO would be permitted to use.  ANCO claimed the lender was not permitting it access to enough funds to pay the Receivable.

ANCO provided yet an additional proposal to Toscana to address the Receivable.  ANCO explained it was anticipating a payment from an investor to purchase shares in a company related to ANCO, Cognati Cheese Co., which would result in ANCO receiving $300,000 ("the Cognati transaction").  ANCO represented to me that the Cognati Transaction would close during the week of December 11, 2017 and that Toscana would be paid one half of the proceeds from that transaction, $150,000, during the week of December 18, 2017.

ANCO also represented that it expected to be acquired by a third party ("the Sale of the Company Transaction"), and that it would pay the remaining Receivable (which would be approximately $350,000 if the payment from the Cognati Transaction was made to Toscana) from the proceeds from the Sale of the Company transaction.  ANCO claimed the closing of that transaction would take place on January 12, 2018.

By letter dated December 18, 2017, Toscana, through counsel, confirmed the terms of the foregoing agreement.

F.    **ANCO Fails To Make Any Payment From The Cognati Transaction And Issues A Form Letter To Its Vendors (Including Toscana) That It Would Be Acquired Through A Purchase Of Its Assets**

ANCO did not proceed with the Cognati transaction and did not make any payment to Toscana, let alone the $150,000 payment it promised to make from the proceeds of that transaction.

When Mr. Paparazzo inquired about the status of the Cognati Transaction, ANCO claimed the putative purchaser of the Cognati shares would not advance payment for the shares because ANCO owed him more money from other transactions than he would have been required to pay for the shares.  Upon information and belief, ANCO refused to proceed with the

11

Cognati transaction unless the putative purchaser advanced additional cash for the purchase of the shares. Rather than proceed with the transaction by providing the putative purchaser with the Cognati shares in return for a forgiveness of $300,000 of the debt it owed the putative purchaser, ANCO elected not to proceed with the transaction.

ANCO subsequently issued to Toscana a letter/notice from its parent, Schratter Foods, Inc. The letter was addressed to ANCO's "partner" and announced that Schratter was selling the assets that "are used in the connection with their ANCO and Corman Divisions." The letter did not advise Toscana what would happen with the Receivable, or whether it would be paid. Indeed, contrary to the oral agreement ANCO made that the balance of the Receivable would be paid at the closing of the transaction whereby ANCO was sold to a third party, the letter did not address whether or how Toscana would be paid as part of the sale transaction.

Despite characterizing Toscana's support (and the support of ANCO's other vendors) as "the biggest asset of the Company," the letter in essence announces that ANCO would be cannibalized by way of its assets being sold, with no provision being put in place to pay ANCO's trade debts to its vendors, including Toscana.

Thus, notwithstanding Toscana's and Mr. Paparazzo's efforts to preserve the relationship and to obtain payment for the goods indisputably delivered to and accepted by ANCO, it now appears that ANCO may proceed with the sale of its assets and not make any payment to Toscana.

While Toscana struggles to remain in business, the equity holders in ANCO will be permitted to sell their shares in ANCO and walk away from the debts of the business. The Court should not permit ANCO and/or its principals to proceed in such matter. As a direct and proximate result of the foregoing, Toscana will suffer irreparable harm. As a small company, a loss of $582,201.95 based on ANCO's failure to pay will be disastrous to Toscana and may

12

cause it to cease operations. Indeed, with such a large receivable, and no prospect for payment, Toscana's lenders may freeze lending to Toscana and cripple its ability to continue as a going concern. Further, given that the assets of ANCO/Corman will be purchased by a third party in the near future, leaving ANCO/Corman as a shell, Toscana will likely not obtain any further payment from ANCO following the sale to the third party.

Given the foregoing, we respectfully request on behalf of Toscana that the Court grant this application for temporary restraints and enter the proposed order to show cause.

## LEGAL ARGUMENT

The standards for granting a preliminary injunction are well settled in New Jersey. The movant must demonstrate:

(a)   "a reasonable probability of ultimate success on the merits," Crowe v. DeGioia, 90 N.J. 126, 133 (1982);

(b)   that the movant will suffer "substantial, immediate and irreparable harm" if the relief is denied, Subcarrier Communications, Inc. v. Day, 299 N.J. Super. 634, 638 (App. Div. 1997); and

(c)   that the harm to the movant if the relief is denied "will be greater than" the harm to the opposing party if the relief is granted, Ispahani v. Allied Domecq Retailing USA, 320 N.J. Super. 494, 498 (App. Div. 1999).

Here, Toscana has met all of the requirements for the issuance of a temporary restraining order.

### A.   Toscana Demonstrates A Reasonable Probability Of Success On The Merits For Each Of Its Claims

Toscana is able to demonstrate a reasonable probability of success on the merits of each of its five claims.

#9664119.1(154375.006)

1.   **Breach of Contract And Breach Of The Implied Covenant Claims**

To succeed on a breach of contract claim, the Plaintiff must prove the following elements:  1) a valid contract between the parties; 2) the opposing party's failure to perform a defined obligation under the contract, and 3) the breach caused the claimant to suffer damages. Envirofinance Group, LLC v. Environmental Barrier Company, LLC, 440 N.J. Super. 325, 345 (App. Div. 2015).

To prevail on a claim of breach of the implied covenant of good faith and fair dealing, the Plaintiff must prove the following elements:  1) there was a contract between plaintiff and defendant; 2) plaintiff performed; 3) the defendant engaged in conduct separate and apart from the performance of obligations under the contract, without good faith and for the purpose of depriving the plaintiff of rights and benefits under the contract; and 4)  such conduct caused plaintiff to suffer injury, damage, loss or harm.  Wade v. Kessler Institute, 343 N.J. Super. 347 (App. Div. 2001).

Here, there was plainly a contract between the parties, as set forth and explained in the Paparazzo Cert., and Toscana clearly performed under the contract by delivering the cheese and cheese products to ANCO.  The facts further demonstrate that ANCO has not only failed and refused to pay Toscana for the goods delivered to and accepted by ANCO, but also that ANCO has engaged in conduct outside the contract designed to prevent Toscana from collecting the funds to which it is entitled for such deliveries.  It is beyond dispute that ANCO has repeatedly made promises to Toscana to pay the Toscana Receivable in full on multiple occasions.  Yet, ANCO has failed and refused to live up to any of those promises, all the while negotiating a sale of its assets that would (or could) render ANCO unable to pay the Toscana Receivable, and render ANCO, itself, judgment proof.  ANCO's failure to pay for the goods manufactured for and delivered to it has caused Toscana substantial damages.  Plainly, there is a reasonable

14

probability that Toscana will prevail on the merits of its breach of contract and breach of the implied covenant claims.

### 2.    Fraudulent Inducement

There are five elements to a claim for fraudulent inducement:   (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment.  See Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 624 (1981)).

The Paparazzo Cert. demonstrates that there is a reasonable probability that Toscana will prevail on the merits of this claim.  As set forth in Mr. Paparazzo's certification, while ANCO was in default by not paying for goods already delivered and accepted by ANCO, ANCO obtained further product from Toscana by making claims that product was needed to generate funds for payment to Toscana, and that Toscana would be paid for the deliveries that had been made.  These promises were false when made, were made to induce Toscana to deliver product to ANCO, were relied upon by Toscana, and Toscana has suffered damages as a result of ANCO's fraudulent misrepresentations.  Moreover, there is no dispute that ANCO made such misrepresentation on multiple, successive occasions, all of which enabled ANCO to continue the negotiations for its sale of assets.  The misrepresentations were made for the obvious purpose of stringing Toscana along, with the hope or expectation that the sale of assets would occur prior to the payment being made to Toscana.  In these circumstances, Toscana is reasonably probable to succeed on its fraudulent inducement claim.

### 3.    Unjust Enrichment

To demonstrate unjust enrichment, the plaintiff must show that the defendant "received a benefit and that the retention of that benefit without payment would be unjust; and that the

15

plaintiff "expected remuneration and the failure to give remuneration unjustly enriched the defendant." EnviroFinance Group, LLC, 440 N.J. Super. at 350.

Here, the incontrovertible facts set forth in the Paparazzo Cert. demonstrate Toscana manufactured cheese/cheese products for ANCO with the expectation that it be paid for the manufacture, delivery and packaging of those goods. The facts are equally clear that, despite delivery of those goods by Toscana, ANCO's acceptance of same, and repeated promises for payment, ANCO has failed and refused to pay for the goods. Nor is there any doubt that ANCO has been enriched by its retention of the products delivered by Toscana, given that the sole reason ANCO ordered such goods from Toscana was to resell those goods to ANCO's own customers. By obtaining and retaining/reselling the cheese products delivered by Toscana, ANCO has undeniably been unjustly enriched. There is a substantial likelihood Toscana will prevail on the merits of this claim.

### 4.   Fraudulent Conveyance Claim

The Supreme Court of New Jersey has established there are essentially two elements a plaintiff must meet when claiming a transfer constitutes a fraudulent conveyance. See Gilchinsky v. National Westminster Bank N.J., 159 N.J. 463 (1999). "The first is 'whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them' at some point in time 'but for the conveyance.'" Id. at 475 (citations omitted). The second element is "whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor." Transfers calculated to hinder, delay or defeat collection of a known debt are deemed fraudulent because of the debtor's intent to withdraw the assets from the reach of process." Id. at 476 (citations omitted). To determine fraudulent intent, courts look to the "badges of fraud" set forth in the fraudulent conveyance statute. Id. Indeed, "badges of fraud" represent circumstances that so frequently accompany fraudulent

transfers that their presence gives rise to an inference of fraud. Id. In this regard, the Supreme Court of New Jersey has approvingly quoted an out-of-state Court's explanation that, while "one" badge of fraud may be sufficient to find actual intent to defraud, a combination of one or more of the badges of fraud in a single transaction will almost always demonstrate actual fraudulent intent for purposes of the fraudulent conveyance statute:

> [Badges of Fraud] are said to be the facts which throw suspicion on a transaction, and which call for an explanation. . . . More simply stated, they are signs or marks of fraud. They do not of themselves or per se constitute fraud, but they are facts having a tendency to show the existence of fraud [ .... ] 'Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent. (Id. (quoting Schall v. Anderson's Implement, Inc., 484 N.W.2d 86, 91 (1992)).

Toscana is likely to succeed on the merits of its fraudulent conveyance claim. While ANCO was falsely representing to Toscana that it would be paid in full for the entire amount of the Toscana Receivable, ANCO was also in the process of becoming involved in a sale of its assets to a third party. By transferring its assets to a third party, while simultaneously increasing the debt owed to Toscana, without having the funds to pay for such goods being shipped to ANCO, ANCO engaged in a transaction that is fraudulent as to Toscana. In this regard, the facts set forth in the Paparazzo Cert demonstrate ANCO is engaging in the sale of its assets with the actual intent to frustrate Toscana's ability to collect the Toscana Receivable from ANCO. Indeed, many of the "badges of fraud" demonstrating actual intent to defraud are present here: the insiders of ANCO, the officer/director equity holders, are retaining the value of ANCO's assets, i.e., cash, following the proposed transaction; ANCO was sued or threatened with suit prior to the transaction; the transfer is for substantially all of ANCO's assets, and the sale of ANCO's assets occurred shortly after ANCO incurred a substantial debt to Toscana.

17

As noted by the Gilchinsky Court, the presence of even one "badge of fraud" may demonstrate actual fraudulent intent; where, as here, multiple badges of fraud are involved in the transaction, the conclusion the debtor possessed the requisite intent is "inescapable." See id. at 483-84 ("Where several badges of fraud accompany one transaction, however, a strong inference of fraud arises. Unless a sufficient explanation is supplied, clearly rebutting the inference of actual fraudulent intent, the conclusion that the debtor possessed the requisite intent is inescapable.")

Given the foregoing, it is reasonably probable that Toscana will prevail on the merits of its fraudulent conveyance claim.

**B.    Irreparable Harm**

Toscana is also able to demonstrate that ANCO's wrongful, purposeful conduct is causing it to suffer immediate, irreparable injury. Harm is generally considered irreparable where pecuniary damages may be inadequate because of the nature of the injury or of the right affected. Crowe, 90 N.J. at 133; Scherman v. Stern, 93 N.J. Eq. 626, 631 (E. & A. 1922). A party has suffered irreparable harm and interlocutory relief should be issued "where the subject matter of the litigation would be destroyed or substantially impaired pending hearing were such an injunction not to issue." Coleman v. Wilson, 123 N.J. Super. 310, 319 (Ch. Div. 1973); Dreier, Rowe & Sullivan, Guidebook to Chancery Practice in New Jersey at 180 (9th ed. 2014). Indeed, "[j]ustice is not served if the subject-matter of the litigation is destroyed or substantially impaired during the pendency of the suit." Imperial Trust Co. v. Magazine Repeating Razor Co., 138 N.J. Eq. 20, 27 (Ch. 1946).

Preventing Toscana from obtaining payment for the Toscana Receivable, and rendering ANCO a judgment-proof shell is precisely the type of wrongful conduct that constitutes irreparable harm. In Ferraiuolo v. Manno, 1 N.J. 105, 107-08 (1948), the Court affirmed the

18

trial court's entry of a preliminary injunction to enjoin the defendant's wrongful conduct where, as here, the defendant's conduct threatened to destroy the plaintiff's business. The Court held that "[a]cts destroying a complainant's business, custom, and profits do an irreparable injury and authorize the issue of a preliminary injunction." Here, while there is no question that Toscana is entitled to be paid for the cheese products ordered by ANCO, ANCO's conduct in rendering itself judgment proof is the very conduct the <u>Ferraiuolo</u> Court found constituted irreparable harm, justifying the imposition of a preliminary injunction. In the event Toscana becomes unable to collect the entirety of the Toscana Receivable from ANCO, the loss of such a large amount of cash for a small company such as Toscana could be disastrous. In addition to the obvious problems inherent in having incurred the production costs to manufacture the product for ANCO and not being able to cover such costs (not to mention profit) there is a significant probability that Toscana's lenders will freeze its credit facility for the amount of the receivable that is more than 90 days past due (at this time, more than $300,000 of the receivable is 90 days past due).

Moreover, numerous courts have found in the precise circumstances here that the Defendant's conduct in rendering itself judgment proof or unable to pay a likely judgment constitutes irreparable harm as a matter of law. See, e.g., <u>Seide v. Crest Color, Inc., et al.</u>, 835 <u>F. Supp.</u> 732, 735-36 (S.D.N.Y. 1993) (finding irreparable harm element met and granting injunction where sale of defendant's assets would potentially render defendant judgment proof); <u>Lowry v. Smith Metal Arts Co., Inc.</u>, No. Civ. 90-987E, 1990 WL 154708 (W.D.N.Y., Sept. 28, 1990) (irreparable harm satisfied where sale of defendant's assets threatened to deprive plaintiff of payment to which he was entitled) (Attached hereto as Exhibit A); <u>see also</u> <u>Mitsubishi Power Systems Americas, Inc. v. Babcock & Brown Infrastructure Group US, LLC, et al.</u>, No. 4499-

19

VCL, 2009 WL 1199588 (Ct. Chancery, April 24, 2009) ("The threat of a fraudulent transfer will constitute irreparable harm warranting injunctive relief.") (Attached hereto as Exhibit B).

C.    **Balancing Of Equities/Public Interest**

Lastly, the balance of equities favor the entry of a temporary restraining order. If an injunction is entered, ANCO will simply be required to do what it is already obligated to do, i.e., pay Toscana for the cheese products Toscana manufactured and delivered to ANCO. This will not harm or injure ANCO, but rather merely requires ANCO to do what it already agreed to do. If no injunction is entered ANCO will in essence be permitted to escape from its debt to Toscana, even though, upon information and belief, ANCO has re-sold the cheese manufactured by Toscana and profited thereby. Plainly, in these circumstances, the balance of the equities tips in favor of Toscana.

Further, the public interest would also weigh in favor of a temporary restraining order, given that it is in the public's interest for companies such as Toscana to remain in business, continue to employ its staff of 100 employees and contribute to the commerce of the State of New Jersey. In the absence of a temporary restraining order, and Toscana loses the ability to collect the Toscana Receivable from ANCO, there is a significant probability that Toscana's business will suffer significant harm and weakened as a going concern. Indeed, Toscana's lenders may freeze its lending facilities with Toscana and prevent Toscana from continuing to finance its business and payments to its employees.

In short, Toscana has met all of the Crowe factors warranting the entry of a temporary restraining order. The Court should enter the order to show cause seeking temporary restraints and schedule a hearing for a preliminary injunction to determine whether such restraints should be imposed throughout the pendency of this litigation.

**D.    Granting Toscana's Application Would Comport With Results Reached By Other Courts In Similar Circumstances**

Entering temporary restraints in the context of this case would be consistent with the result reached in a similar case before the Delaware Court of Chancery, <u>Mitsubishi Power Systems Americas, Inc. v. Babcock & Brown Infrastructure Group US, LLC, et al.</u>, No. 4499-VCL, 2009 WL 1199588 (Ct. Chancery, April 24, 2009).

In that matter, the plaintiff, Mitsubishi Power Systems Americas, Inc. ("Mitsubishi") manufactured wind turbines used for electrical power for defendant Babcock & Brown ("Babcock"). Babcock failed to make certain progress payments. Mitsubishi stopped production, but continued to negotiate with Babcock towards an amicable solution. Mitsubishi learned in or about April, 2009 that Babcock was taking steps to sell certain wind generating assets.

Mitsubishi filed an application for a temporary restraining order arguing, among other things, that Babcock's sale of wind generating assets constituted a fraudulent conveyance and would deprive Mitsubishi of an opportunity to collect funds that were indisputably due to Mitsubishi. In its application, Mitsubishi sought to enjoin transfers by Babcock outside of the normal course of business, with the exception that sales of assets for fair value could be made by defendants so long as the proceeds were then held in escrow pending the conclusion of the lawsuit.

The Court granted Mitsubishi's application for as to the principal Babcock defendant involved in the lawsuit, reasoning as follows:

> As to [the principal Babcock entity], the court is convinced that the equities of a temporary restraint against upstream transfers fall in [Mitsubishi's] favor. Such a restraint would not prohibit [that entity] from engaging in asset sales to third parties for fair value. It simply requires that the proceeds of such sales be placed in escrow pending further consideration of these claims on a motion

21

for a preliminary injunction. This restraint also poses no creditable threat to Babcock since it would not appear to trigger any event of default under the Agreed Asset Sales Program. (Id. at 2009 WL 1199588 at *5).

Here, Toscana is seeking similar relief to prevent ANCO's from placing its assets beyond Toscana's ability to collect for the Toscana Receivable. Just as the Vice Chancellor of the Delaware Court of Chancery temporarily enjoined Babcock from dissipating funds from its sale of assets, we respectfully request this Court to enjoin ANCO from dissipating the funds from the sale of its assets to a third party (at least up to the amount of the Toscana Receivable). As explained in further detail above, unless this Court grants such relief, Toscana will suffer immediate, irreparable harm

## CONCLUSION

For all of the foregoing reasons, Toscana respectfully requests that the Court enter the proposed order to show cause and temporary restraints.

DATED: January 3, 2018

Respectfully submitted,

WILENTZ, GOLDMAN & SPITZER, P.A.

BY: _____
JAMES E. TONREY, JR.
Attorneys for Plaintiff
Toscana Cheese Co., Inc.

# EXHIBIT A

Lowry v. Smith Metal Arts Co., Inc., Not Reported in F.Supp. (1990)

1990 WL 154708
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Norman K. LOWRY, Plaintiff,
v.
SMITH METAL ARTS CO., INC. and Smith Metal
Arts/McDonald Products, Defendants.

No. Civ-90-987E.
|
Sept. 28, 1990.

## Attorneys and Law Firms

Charles Getman, Buffalo, N.Y., for plaintiff.

John B. Drenning, Joseph V. Sedita, Buffalo, N.Y., for
defendants.

## MEMORANDUM and ORDER

ELFVIN, District Judge.

*1 Plaintiff Lowry has asked this Court for an order
temporarily restraining defendant Smith Metal Arts Co.,
Inc. ("Smith Metal") from disposing of certain proceeds
to be obtained from the anticipated sale of company
assets. Lowry believes that Smith Metal is presently
attempting to sell a division of the company in an effort to
raise cash and reduce borrowings.

Lowry is a shareholder in Smith Metal. Pursuant to a
shareholder agreement ("the Agreement") between Lowry
and Smith Metal, Lowry possesses the right to compel
Smith Metal to purchase his shares ("the Put") on March
31, 1990 or any March 31st thereafter, as provided in the
Agreement. Presently disputed is whether Lowry had the
right to exercise his option in June 1990.

Lowry asserts that his attempted exercise was timely
because of an oral agreement between the parties altering
the written terms of the Agreement. As such, Lowry
asserts that, by virtue of his exercise, he is now a creditor
of Smith Metal and not merely a shareholder.

The defendants assert that no oral agreement was ever
reached whereby the terms of the Agreement were thus

substantially altered. Consequently, the defendants assert
that Lowry's June 1990 attempt to exercise his option was
untimely. Also disputed by the defendants is whether
Lowry's employment was terminated December 31, 1989,
which change of status would permit him to exercise his
Put *any* time after March 31, 1989 (pursuant to the terms
of the Agreement).

Lowry requests injunctive relief to protect his alleged
interest in the assets of the anticipated sale, pending a
decision on the merits of his claim. To obtain this relief
Lowry must show irreparable harm and either (i) a
likelihood of success on the merits or (ii) sufficiently
serious questions going to the merits to make them a fair
ground for litigation and a balance of hardships tipping
decidedly toward him. *See American Postal Workers
Union v. United States Postal Service,* 766 F.2d 715, 721
(2d cir.1985), *cert. denied,* 475 U.S. 1046 (1986); *United
States v. Siemans Corp.,* 621 F.2d 499 (2d Cir.1980).

This Court finds that Lowry has met his burden. Clearly,
if Lowry's assertions prove to be correct and he rightfully
exercised his Put option in June 1990, the disposal of
assets prior to his obtaining the status of creditor would
deprive him of his rightful portion thereof. Further, this
Court finds that there are serious questions surrounding
the alleged oral agreement and Lowry's status as
employee. These questions go to the merits Lowry's
claim. Finally, because the anticipated sale of corporate
assets may not occur for some time (if at all) and because
Lowry requests that only a relatively small percentage of
the anticipated revenues be held in escrow, this Court
finds that the balance of hardships tips decidedly in
Lowry's favor.

Thus, it is hereby ORDERED that, in the event there is
any sale of assets out of the ordinary course of business,
Smith Metal shall place in escrow $158,333.33, plus
interest from August 29, 1990, that such mandate shall
remain in effect until such time as the plaintiff's motion
for a preliminary injunction can be heard and
determined on the merits or until this temporary
restraining order expires on October 15, 1990, whichever
comes first. This temporary restraining order continues
and replaces the temporary restraining order imposed by
this Court September 24, 1990, and is conditioned by the
posting of a $2,500 bond.

## All Citations

Not Reported in F.Supp., 1990 WL 154708

Lowry v. Smith Metal Arts Co., Inc., Not Reported in F.Supp. (1990)

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

Mitsubishi Power Systems Americas, Inc. v. Babcock &..., Not Reported in A.2d...

KeyCite Yellow Flag - Negative Treatment
Distinguished by Henson v. Sousa, Del.Ch., December 19, 2012
2009 WL 1199588
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware,
New Castle County.

Re: MITSUBISHI POWER SYSTEMS AMERICAS,
INC.
v.
BABCOCK & BROWN INFRASTRUCTURE
GROUP US, LLC, Babcock & Brown, L.P.,
Babcock & Brown Holdings, Inc., Babcock &
Brown Renewable Holdings, Inc., and Babcock &
Brown International Party Ltd.

C.A. No. 4499–VCL.
|
Submitted: April 22, 2009.
|
Decided: April 24, 2009.

West KeySummary

1        **Injunction**
          Freezing or protecting assets pending
          litigation

The industrial concern plaintiff was entitled to a
temporary restraining order prohibiting the
corporate defendant from transferring any assets
other than in the ordinary course. The plaintiff
asserted that the defendant breached its
obligation under turbine supply agreements,
resulting in massive damages to the plaintiff.
The defendant disputed the magnitude of the
damages, but acknowledged that it did in fact
breach the turbine supply agreements by failing
to make certain progress payments under the
agreements as they became due.

3 Cases that cite this headnote

**Attorneys and Law Firms**

Kevin F. Brady, Esquire, Connolly Bove Lodge & Hutz
LLP, Wilmington, DE.

Kenneth J. Nachbar, Esquire, Morris, Nichols, Arsht &
Tunnell LLP, Wilmington, DE.

**Opinion**

STEPHEN P. LAMB, Vice Chancellor.

*1 Dear Counsel:
I have read and considered the briefs and arguments
regarding the plaintiff's motion for a temporary
restraining order heard by telephonic conference on April
22, 2009. For the reasons set forth herein, the plaintiff's
motion will be granted in part and denied in part. An
implementing order is being entered contemporaneously
with this ruling.

I.

Mitsubishi Power Systems Americas, Inc. ("MPSA") is
an industrial concern engaged in the manufacture and sale
of, among other things, wind turbines used for the
production of electrical power. The various Babcock &
Brown defendant entities form part of a corporate group
based in Australia which operates a global investment
business through over 1500 worldwide subsidiaries
(collectively "Babcock"). Until recently, the parent entity
of the group, Babcock & Brown Limited ("BBL"), was
publicly-traded on the Australian Stock Exchange.
Babcock's operations are managed by BBL's operating
subsidiary, Babcock & Brown International Party Limited
("BBIPL"). Through BBIPL, Babcock capitalizes its
various subsidiaries through the use of BBIPL's
syndicated credit facility. In order to facilitate this, BBIPL
maintains a treasury management policy in which excess
cash balances in its subsidiaries are swept up to BBIPL,
where they are used to maintain the credit facility
obligations and provide capital for the various Babcock
subsidiaries.

Among Babcock's various investment interests is the
wind-power generation business. Although it ultimately
operates this business through a number of

Mitsubishi Power Systems Americas, Inc. v. Babcock &..., Not Reported in A.2d...

special-purpose entities, it initiates each of these wind farm projects through its subsidiary Babcock & Brown Infrastructure Group US, LLC ("BBIG"), a Delaware limited liability company. Pursuant to that general practice, BBIG entered into a pair of Turbine Supply Agreements ("TSAs") in 2007 and 2008 with MPSA. Under those TSAs, MPSA was to manufacture and deliver a total of 456 wind turbines, for a total purchase price in excess of [redacted]. Because BBIG did not have its own source of capital sufficient to perform under the TSAs, MPSA required BBIPL to guarantee the obligation of BBIG under the TSAs. In return, so long as the BBIPL guarantee was in place, BBIG (and any entity succeeding to BBIG's rights by assignment under the TSA) had the right to assign its rights and obligations under the TSA to any affiliate entity without the consent of MPSA. The TSAs further provided that such assignments would have the effect of extinguishing BBIG's obligations to MPSA under the contract.

In order to manufacture and deliver wind turbines in the quantity required under the TSAs, MPSA was required to incur significant expenses. Thus, the TSAs provided for BBIG to make progress payments to MPSA upon the achievement of certain milestones. One such progress payment was due in May 2008 on the 2007 TSA, and another in August 2008 on the 2008 TSA, totaling [redacted]. Neither payment has been made. BBIG told MPSA that the nonpayments were due to financial difficulties that it was working to resolve, and MPSA permitted work to continue on the wind turbines in reliance on these representations. On November 20, 2008, no progress payments having been made, MPSA informed BBIG that it was suspending production under the TSAs. MPSA and BBIG nevertheless continued to negotiate towards an amicable solution through the first quarter of 2009. As a result of the effective termination of the TSAs, MPSA now claims it has suffered nearly a billion dollars in damages.

*2 BBIG's inability to make its progress payments to MPSA as they came due in 2008 apparently resulted from the effects of the current credit crisis on BBIPL's ability to finance its business. Last year, as credit markets contracted and economic conditions worsened, Babcock's credit ratings suffered a series of downgrades over the course of the summer. In July 2008, faced with the possible breach of certain covenants related to BBL's market capitalization under BBIPL's senior secured credit facility, BBIPL reached a deal with its lenders. Pursuant to that agreement, the lenders agreed to waive the covenant at issue in exchange for BBIPL's promise to prepay approximately $400 million of debt under the credit facility. Funding to accomplish that prepayment

was to come from asset sales that Babcock planned to engage in over the following three months. Additionally, Babcock agreed to pay down approximately half of its $2 billion outstanding debt under the credit facility by 2011 through additional asset sales.

Babcock's financial fortunes continued to deteriorate through the first quarter of 2009. On February 6, 2009, BBIPL entered into a further agreement with the syndicate of lenders under its senior secured credit facility to sell all of BBIPL's and its subsidiaries' assets and provide the proceeds, net of expenses, to the senior secured lenders (the "Agreed Asset Sales Program"). Importantly however, the security interests of BBIPL's senior secured lenders do not appear to extend to the assets of BBIG. Finally, on March 13, 2009, following the rejection by noteholders of a proposed restructuring of the terms of certain unsecured notes of Babcock, the board of BBL placed the company in voluntary administration.[1]

After discovering that Babcock had been placed into administration, MPSA became concerned that assets of BBIG were being dissipated in order to pay off BBIPL's senior secured lenders.[2] Thus, as part of its ongoing discussions with BBIG to reach a settlement, in mid-March 2009 MPSA began asking BBIG for details of certain asset transfers that BBIG had made to affiliates over the course of the previous year.[3] Although communications between the two companies continued during this time, MPSA received no response to these inquiries.

Then, on April 8, 2009, MPSA learned from a trade publication that Babcock had taken steps to sell certain U.S. wind generating assets, and would be accepting a second round of bids for these assets on or about May 8, 2009. Concerned that these planned future sales would result in the continued dissipation of assets that MPSA believed should be available to satisfy the creditors of BBIG (including itself), MPSA filed a complaint in this court on April 9, 2009. The complaint alleges that BBIG had engaged in fraudulent transfers to affiliates of certain assets for less than fair value, that BBIG had made improper distributions under the Delaware Limited Liability Company Act,[4] and two alternative theories of its breach of contract claim against BBIG.

*3 MPSA also filed a motion for expedited proceedings and a motion for preliminary injunction. Concerned that it be able to develop a fact record sufficient to support a preliminary injunction application in time to prevent the upcoming Babcock asset sales, MPSA also sought a highly expedited discovery schedule to be completed by May 6. During an April 13 teleconference to consider the

Mitsubishi Power Systems Americas, Inc. v. Babcock &..., Not Reported in A.2d...

motion to expedite, this court encouraged the parties to come to an agreement as to a status quo order and a less onerous discovery schedule, and suggested that if the parties could not do so the court would entertain a motion by MPSA for a temporary restraining order. The parties came to an agreement on a short-term status quo order, but were unable to agree as to a longer-term order to last until the matter could be made ready for a preliminary injunction proceeding. Meanwhile, expedited discovery began on April 13.

Concerned about the approaching April 22 expiration of the agreed upon status quo order, MPSA moved for a temporary injunction on April 20, 2009. In its application for a temporary restraining order, MPSA seeks to enjoin transfers by any of the Babcock defendants outside of the normal course of business, with the exception that sales of assets for fair value may be made by the defendants so long as the proceeds are then held in escrow.

## II.

"The essential predicate for issuance of [a temporary restraining order] is a threat of imminent, irreparable injury. Once that is shown, the remedy ought ordinarily to issue unless the Court is persuaded (1) that the claim asserted on the merits is frivolous or not truly litigable, (2) that the risk of harm in granting the remedy is greater than the risk to plaintiff of denying it, or (3) that plaintiff has not proceeded as promptly as it might, [and] has therefore contributed to the emergency nature of the application and is guilty of laches."[5]

For the purposes of an application for a temporary restraining order, the analysis of whether the claims asserted are meritorious generally requires nothing more than a showing "that a colorable claim has been made out if the facts alleged are true."[6] The defendants contend, however, because of MPSA's delay in bringing this application, the appropriate standard is the higher burden required to obtain a preliminary injunction—a "reasonable probability of success on the merits."[7] In support of this contention, the defendants cite *Insituform Technologies, Inc. v. Insitu, Inc.*[8] *Insituform*, however, stands for the proposition that "[w]here ... the applicant [for a temporary restraining order] has had the opportunity to develop evidence and present a record from which the court may 'responsibly make a more informed judgment concerning the merits,' ... 'the elements of the equitable test is something akin to the traditional preliminary injunction formulation.'"[9] There is no reason to believe here that the discovery process set in

motion merely a week ago has been completed, nor that MPSA has had an opportunity to develop the fact record to the degree necessary for the court to "responsibly make a more informed judgment concerning the merits." Thus, the court will apply the normal "colorable claim" standard to the merits analysis here.

*4 MPSA alleges in its complaint that BBIG has breached its obligations under the TSAs, resulting in massive damages to MPSA. Although BBIG disputes the magnitude of the damages, BBIG tacitly acknowledges in its briefs that it did in fact breach the TSAs by failing to make certain progress payments under the agreements as they became due. MPSA has, therefore, stated a colorable claim for breach of contract against BBIG.

The threat of irreparable injury arises from a different source. MPSA further alleges that BBIG has engaged in fraudulent transfers to its affiliates and intends to do so again in the near future. The threat of a fraudulent transfer will constitute irreparable harm warranting injunctive relief.[10] Thus, MPSA's showing of imminent, irreparable harm hangs on its ability to demonstrate a colorable claim that BBIG intends to engage in one or more fraudulent transfers in the near future.

The Delaware Uniform Fraudulent Transfer Act (the "DUFTA") is codified at 6 *Del. C.* § 1301 *et seq.* Section 1305 of the DUFTA reads:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor[11] whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider[12] for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent.

Section 1302 of the DUFTA defines "insolvent" for the purposes of the Act as follows:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.

(b) A debtor who is generally not paying debts as they become due is presumed to be insolvent.

Mitsubishi Power Systems Americas, Inc. v. Babcock &..., Not Reported in A.2d...

BBIG's assets at present appear to be on the order of $60 million or less.[13] BBIG's unpaid obligation to MPSA for the missed progress payments under the TSAs (ignoring any alleged setoffs) total $86 million. In addition, MPSA claims that BBIG owes it much greater damages for costs it incurred to begin the manufacturing process of the wind turbines, in reliance on BBIG's promises to pay, as well as MPSA's lost profits on the agreements. It thus appears, in all likelihood (and at the very least there is a colorable argument) that BBIG's debts exceed its assets, thereby making it insolvent. Moreover, BBIG has acknowledged that, at least with respect to MPSA, it failed to pay its debts as they became due with respect to the progress payments under the TSAs, leading to the presumption that BBIG is insolvent.

Thus, MPSA has made a colorable claim that any future transfer by BBIG of assets for less than reasonably equivalent value would be fraudulent as to MPSA.[14] Moreover, if in fact BBIG is insolvent (and BBIG's parent entities have reasonable cause to believe so) any future transfer to BBIG's parent entities, as insiders, on account of preexisting intercompany debt would be fraudulent *per se.*[15]

**\*5** Babcock states that, as a matter of standard operating procedure, material cash assets in its operating subsidiaries are swept up to BBIPL for redeployment elsewhere in the business, or, now, to repay BBIPL's senior secured debt. Although Babcock contends that it has no plans for any asset sales by BBIG in the near future, it became clear during oral argument that this is not entirely accurate. Rather, what emerged was that a sale is now being negotiated for BBIG's interest in BIFNA, which is expected to close in three to six weeks.[16] In addition, BBIG is seeking bidders for its interests in its "G3," "Pampa," and "Central Valley Transmission" projects. If BBIPL were to cause BBIG to transfer the proceeds of these sales upstream, as it would otherwise do, such transfers would arguably be fraudulent as to MPSA.[17]

MPSA also alleges that BBIG has already engaged in one fraudulent transfer, the so-called "Trans Bay Transaction." Babcock admits that on June 27, 2008, BBIG sold all of its interest in Trans Bay Funding LLC to BIFNA for [redacted] in cash.[18] "Per its treasury management policy, BBIG transferred those proceeds upstream to [Babcock & Brown, L.P., which in turn] transferred those proceeds upstream to BBIPL."[19] BBIG had by this time already defaulted on one progress payment to MPSA, and shortly thereafter defaulted on the second. It is therefore at least colorable that BBIG was

insolvent by the time the proceeds of the Trans Bay sale were swept up to BBIPL from BBIG. That transfer of funds, for the same reasons described above for the anticipated future transfers, was arguably fraudulent as to MPSA. Thus, in this respect also, the complaint states a colorable claim. Because a defrauded creditor may seek recovery not only from the transferor but from a transferee as well,[20] MPSA seeks to enjoin transfers by BBIPL and the entities it owns through which the Trans Bay funds passed.

Turning to the balancing of equities, the court may grant a temporary restraining order only if the risk to the defendant of an improvidently granted order is not greater than the risk to the plaintiff of denying the application. As to BBIG alone, the court is convinced that the equities of a temporary restraint against upstream transfers fall in MPSA's favor. Such a restraint would not prohibit BBIG from engaging in asset sales to third parties for fair value. It simply requires that the proceeds of such sales be placed in escrow pending further consideration of these claims on a motion for a preliminary injunction. This restraint also poses no creditable threat to Babcock since it would not appear to trigger any event of default under the Agreed Asset Sales Program.

As to a broader restraint, reaching the other Babcock entities, however, the equities fall firmly in the defendants' favor. As part of the terms of the Agreed Asset Sales Program, an injunction against any of BBIPL's Material Subsidiaries (defined in the agreement to include the other entities a broader restraint would reach, but not BBIG) would likely constitute an event of default. Such event of default would entitle the banks to immediately place BBIPL into receivership and begin a rapid liquidation of Babcock's assets at "fire sale" prices. Babcock argues convincingly that such a liquidation would be injurious not only to the Babcock entities and the current plan of orderly liquidation, but to many of the stakeholders in Babcock as well.[21] MPSA dismisses the risk of this "parade of horribles" as remote and not in the economic interests of the banks. But the court is unwilling to expose Babcock to such potentially ruinous developments. In this connection, the court notes that MPSA entered into the TSAs in reliance on the credit of BBIPL, not BBIG, and yet has not sued BBIPL on its guarantee. That BBIG both retains any liability on the TSAs and has substantial asset to which MPSA can look to recover its loss are matters of mere happenstance. In the present circumstances, the court will act to protect MPSA's rights in the assets of BBIG, but it will not enlarge those rights in a manner that threatens the interests of all other stakeholders in Babcock.

Mitsubishi Power Systems Americas, Inc. v. Babcock &..., Not Reported in A.2d...

*6 Thus, the court concludes that MPSA is entitled to a temporary restraining order prohibiting BBIG from transferring any assets other than in the ordinary course, except that it may pursue third-party asset sales so long as any proceeds from those sales be kept in escrow. To that extent, MPSA's motion is GRANTED IN PART. To the extent that MPSA seeks injunctive relief against any of the other defendants, MPSA's motion is DENIED IN PART. An order implementing this decision will be entered contemporaneously with this opinion. MPSA will be required to post a $500,000 bond against any harm the

defendants might suffer as a result of the improvident grant of the temporary restraining order. IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2009 WL 1199588

Footnotes

1    Counsel for the Babcock entities has indicated that administration is generally the Australian equivalent to Chapter 11 of the Bankruptcy Code. *See generally* 11 U.S.C. § 1101 *et seq.*

2    Among other things, MPSA noticed in a trial balance sheet it had been given for BBIG earlier that year that BBIG had made over [redacted] in distributions to its equity holders over the course of its lifetime.

3    MPSA appears to have been particularly concerned with BBIG's June 2008 sale of Trans Bay Funding LLC to Babcock & Brown Infrastructure Fund North America LP ("BIFNA"). BBIG received [redacted] in cash proceeds from the sale of Trans Bay. According to Babcock, it swept those proceeds upstream to BBIPL pursuant to its standard treasury management policy.

4    *See* 6 *Del. C.* 18–607(a).

5    *Cottle v. Carr,* 1988 WL 10415, at *3 (Del.Ch.).

6    *UIS, Inc. v. Walbro Corp.,* 1987 WL 18108, at *1 (Del.Ch.).

7    Defs.' Br. in Opp'n 23–24. For the showing necessary to support an application for a preliminary injunction, see, for example, *Hecco Ventures v. Sea--Land Corp.,* 1986 WL 5840, at *3 (Del.Ch.).

8    1999 WL 240347 (Del.Ch.).

9    *Id.* at *7 (citing *Newman v. Warren,* 684 A.2d 1239, 1244 (Del.Ch.1996)).

10   See 6 *Del. C.* § 1307(a), which reads:
     In an action for relief against a transfer or obligation under this chapter, a creditor, subject to the limitations in § 1308 of this title, may obtain:
     ...
     (2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by applicable law;
     (3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:
     a. An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;
     ...
     c. Any other relief the circumstances may require.

11   For purposes of the Act, a creditor is defined as "any person who has a claim." 6 *Del. C.* § 1301(4). A claim is defined as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 6 *Del. C.* § 1301(3). Thus, MPSA's unliquidated, contingent, disputed, unsecured right to payment under the TSAs is nevertheless a claim for purposes of the Act, and MPSA thereby a creditor of BBIG.

Mitsubishi Power Systems Americas, Inc. v. Babcock &..., Not Reported in A.2d...

12      An insider is defined for purposes of the Act as, *inter alia*, a "person in control of the debtor." 6 *Del. C.* § 1301(7)(b)(3). Person is defined in the Act to generally encompass any legal person, natural or otherwise. *See* 6 *Del. C.* § 1301(9).

13      Pl.'s Opening Br. Ex. F, App. D (summarizing the assets of BBIG).

14      *See* 6 *Del. C.* § 1305(a).

15      *See* 6 *Del. C.* § 1305(b).

16      It is expected that BBIG's [redacted] stake in BIFNA will yield approximately [redacted] in cash proceeds. Defs.' Co–Counsel's Letter to the Court of April 22, 2009.

17      Babcock, in its brief, argues that in the context of a treasury management policy like the one it has implemented (in which a parent entity capitalizes its subsidiaries through the use of borrowing which solely obligates the parent), upstream transfers to the parent to repay such borrowings are in exchange for equivalent value because the subsidiary benefits indirectly from the parent's ability to borrow on the basis of the subsidiary's cash flows. Defs .' Br. in Opp'n 28–31. While this argument makes practical commercial sense in the context of a solvent enterprise, it can be seen as ignoring the boundaries between separate legal entities and an insolvent entity's obligations not to make distributions to equity holders. In any event, it is neither necessary nor appropriate to resolve that issue in the present context. All the court need determine today is that MPSA has stated a colorable claim. It has.

18      Lillybeck Aff. ¶¶ 26–29.

19      *Id.* ¶ 29.

20      *See, e.g., August v. August,* 2009 WL 458778 (Del.Ch.).

21      As an example of the harms that would occur as a result of BBIPL being placed in receivership, BBIPL would in all likelihood immediately cease to exist as a going concern, resulting in the immediate displacement of hundreds of present Babcock employees. Additionally, the severance payments to already laid-off Babcock employees that the banks are presently allowing Babcock to pay would likewise be immediately terminated as well. MPSA, if it is able ultimately to prove its case here, should be able to pursue the banks as transferees to recover any fraudulent transfers by BBIG. Clearly, MPSA faces significant risks in that approach as a result of possible differences between U.S. and Australian law. Nevertheless, the court will not risk causing the potential harm to the Babcock entities detailed above to save MPSA the risk of non-recovery, particularly on the basis of an emergency application.

     * * *

---

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT C

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys at Law
90 Woodbridge Center Drive
Woodbridge, New Jersey  07095
(732) 636-8000
Attorneys for Plaintiff,
Toscana Food Corp., Inc.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
HUDSON COUNTY
DOCKET NO. C-190-17

-------------------------------------------------------X
TOSCANA CHEESE CO., INC.,

        Plaintiff,

v.

SCHRATTER FOODS, INC. d/b/a ANCO
FINE CHEESE, INC. and d/b/a
CORMAN SHIP SUPPLIES, INC.,

        Defendants.
-------------------------------------------------------X

Civil Action

**ORDER TO SHOW CAUSE WITH
TEMPORARY RESTRAINTS**

THIS MATTER, having been opened to the Court by Wilentz, Goldman & Spitzer,

P.A.,  counsel for Plaintiff Toscana Cheese Co., Inc. ("Toscana"), seeking relief by way of a

preliminary injunction with temporary restraints pursuant to R. 4:52, based upon the facts set

forth in the Certification of Victor Paparazzo; and it appearing that Defendant, Schratter Foods,

Inc. d/b/a ANCO Fine Cheese, Inc. and d/b/a Corman Ship Supplies, Inc. ("Schratter"), through

its counsel, EPGD Law, was provided with notice of this application and for good cause

shown;

IT IS on this _____ day of January, 2018;

ORDERED THAT

1. Until further Order of this Court, Defendant, its employees, agents and representatives are restrained and enjoined from distributing, transferring and/or otherwise dissipating the sum of $582,201.95 received from the sale of the assets of ANCO Fine Cheese, Inc. and/or Corman Ship Supplies, Inc. and shall place that sum of $582,201.95 into an interest bearing escrow account in a bank located in the State of New Jersey and shall provide the Court and counsel for Toscana the identity of the bank, account number and contact person for the aforesaid escrow account.

AND IT IS FURTHER ORDERED that:

2. Schratter show cause before the Superior Court of New Jersey, Chancery Division, Hudson County, at the William J. Brennan Courthouse, 583 Newark Avenue, Jersey City, New Jersey on the ____th day of January, 2018 at _____ a.m./p.m. or as soon thereafter as counsel may be heard why the following relief should not be granted:

    A. Requiring Defendant to hold in an interest bearing escrow account, until further Order by the Court the sum of $582,201.95, constituting the sum of payments alleged to be due to Toscana.

    B. Such other relief as the Court deems just and equitable;

AND IT IS FURTHER ORDERED that:

3. Defendants shall file and serve a written response to this order to show cause and the request for entry of injunctive relief and proof of service by January ___, 2018. The original documents must be filed with the Clerk of the Superior Court in the county listed

#9662286.1

2

above.  Defendants must send a copy of their opposition papers directly to the undersigned. Defendants must also send a copy of their opposition papers to Toscana's attorney whose name and address appears above.  A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief Toscana is seeking.

4.    Toscana may file and serve any written reply by January __, 2018.  The reply papers must be filed with the Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the undersigned and to counsel for Schratter.

5.    If you do not file and serve opposition to this order to show cause, the application will be decided on the papers on the return date and relief may be granted by default, provided that Toscana filed a proof of service and a proposed form of order at least three days prior to the return date.

6.    If Toscana has not already done so, a proposed form of order addressing the relief sought on the return date (along with a self-addressed return envelope with return address and postage) must be submitted to the court no later than three (3) days before the return date.

7.    If you cannot afford an attorney, you may call Legal Services office in the county in which you live.  A list of these offices is provided.  If you do not have an attorney and are not eligible for free legal assistance you may obtain a referral to an attorney by calling on the Lawyer Referral Services.

8.    The Court will entertain argument, but not testimony, on the return date of the order to show cause, unless the Court and parties are advised to the contrary prior to the return date.

HON. BARRY P. SARKISIAN, P.J. Ch.

_____ OPPOSED

_____ UNOPPOSED

# EXHIBIT D

James E. Tonrey, Jr. (Atty Id. No. 039821994)
WILENTZ, GOLDMAN & SPITZER P.A.
Attorneys at Law
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095
(732) 636-8000
Attorneys for Plaintiff
Toscana Cheese Co., Inc.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
HUDSON COUNTY
DOCKET NO.: C-190-17

---------------------------------------------X
TOSCANA CHEESE CO., INC.,
   Plaintiff,

v.

SCHRATTER FOODS, INC. d/b/a ANCO
FINE CHEESE, INC. and d/b/a
CORMAN SHIP SUPPLIES, INC.,
   Defendants.
---------------------------------------------X

Civil Action

**CERTIFICATION OF
VICTOR J. PAPARAZZO IN
SUPPORT OF APPLICATION FOR
ENTRY OF AN ORDER TO SHOW
CAUSE WITH TEMPORARY
RESTRAINTS**

1. I am the President of Toscana Cheese Co., Inc. ("Toscana").

2. I am submitting this Certification in support of Toscana's application for a preliminary injunction with temporary restraints, enjoining Schratter Foods, Inc. d/b/a ANCO Cheese, Inc. and d/b/a Corman Ship Supplies, Inc. (together, "ANCO") from distributing or disbursing $582,201.95 ("the Toscana Receivable"), from funds obtained from the sale of ANCO's assets to a third party, and requiring ANCO to hold the Toscana Receivable in an interest bearing escrow account for Toscana's benefit pending conclusion of this matter.

3. As explained in further detail below, Toscana manufactures and sells cheese products to third party users and/or distributors, and has supplied ANCO with such

#9664113.1

cheese products for many years. Yet, ANCO recently ceased paying Toscana's invoices and now owes Toscana $582,201.95.

4.       I have attempted on several occasions to obtain payment from ANCO, without success. Despite promises and representations from ANCO that the Toscana Receivable would be paid in full, promised dates of full payment have come and gone and Toscana has not received any payment.

5.       Toscana's legal counsel recently confirmed by letter dated December 18, 2017 the terms of ANCO's latest agreement to pay the Toscana Receivable in full. Instead of confirming that agreement, ANCO provided me with a form letter on December 19, 2017 that not only failed to confirm the Toscana Receivable would be paid, but also announced that ANCO would be acquired by a third party through a sale of ANCO's assets. (See Exhibit A).

6.       Toscana filed its Complaint against ANCO on December 26, 2017. (See Exhibit B)  I thereafter sought some confirmation from ANCO that the Toscana Receivable would be paid prior to the closing on the aforesaid sale of assets, but ANCO failed and refused to provide any such confirmation. Given this, Toscana is now filing this application for the entry of an order to show cause with temporary restraints. We respectfully request the Court to grant this application.

A.       **Background**

7.       Toscana is a corporation of the State of New Jersey. It is located in Secaucus, New Jersey, where it maintains its administrative office and manufacturing facility. Toscana employs approximately 100 persons at its offices and plant.

8.       As part of its operations, Toscana manufactures cheese for its customers 5 or 6 days per week. In doing so, it purchases 1.5 million pounds of milk per week for its plant

from third party suppliers and ships its cheese products to many different customers across the United States.

9. Toscana also packages the cheese products ordered by its customers for resale to third party purchasers. In accordance with its customers' specifications, Toscana orders custom made packaging materials specifically tailored to the customers' specifications, and packs the cheese products with such packaging prior to shipment to the customer.

10. While Toscana strives to increase its production on a yearly basis by increasing its customer base, it is not a large-scale supplier to large supermarket chains or restaurants. Rather, Toscana is a relatively small business, with a concentration of customers in the private label cheese business, meaning that Toscana manufactures cheese for third party suppliers who sell Toscana's cheese under their own private label/brands.

**B. Toscana's Relationship With ANCO And The Standardized Cheese Ordering/Manufacturing That Has Developed**

11. Toscana has been selling cheese to ANCO Fine Cheese ("ANCO") and Corman Ship Supplies ("Corman") for approximately 20 years. ANCO is a wholesale cheese distributor and Corman is a ship chandler, i.e., an entity that supplies products to luxury cruise ships. Both ANCO and Corman obtain their cheese products from Toscana.

12. The way the production and supply relationship between Toscana and ANCO/Corman proceeds has, over the years, become standardized.

13. ANCO and/or Corman contact Toscana to manufacture quantities of cheese at Toscana's manufacturing plant in Secaucus. In response to the orders from ANCO and/or Corman, Toscana orders the milk necessary to make the cheese and begins the process at its plant of actually making the cheese. The milk for the production is ordered from third party suppliers and kept in large silos at Toscana's plant, capable of holding 15,000 – 50,000 gallons

#9664113.1                                3

of milk for short term storage during the cheese manufacturing process. Given the limited shelf life of milk and by-products of milk such as cheese/cheese products, Toscana is unable to make cheese to be kept in stock or storage, but instead must make its cheese in response to specific orders.

14.    At Toscana's plant, the cheese making process requires the heating of milk and the creation of milk curd, the testing of the cheese product by qualified food testing analysts on Toscana's staff, and, among other things, the carting away of waste and cleaning of Toscana's heavy machinery in accordance with health and safety standards promulgated by the FDA. The disposal-of-waste process in the State of New Jersey, and in particular in Secaucus, involves monitoring of the "whey" by-product of the cheese making process, given that such whey may not be disposed through domestic sewer service (the Secaucus Municipal Utilities Authority will not permit such disposal in light of the high CBOD(5) count of such waste), as well as monitoring the amount of TSS (total suspended solids) and whether the refuse is too acidic or basic. This testing is done by qualified professionals on Toscana's staff, as well as by officials from the SMUA, which monitors Toscana's output in light of the damage or strain that could result to SMUA's sewage facility if CBOD(5), TSS and acidic/basic water exceeds permissible levels.

15.    To alleviate issues with "whey" in Toscana's sewage, Toscana separates the whey from its waste stream, and has it carted off-site in large tanker-trucks supplied by New Jersey businesses, to be used by pig farmers in the State of New Jersey.

16.    In addition to the cheese making process, the process of making cheese for ANCO also involves packaging the final product at Toscana's Secaucus Plant. Packaging the products for ANCO requires Toscana to order and pay for the packaging products in the State of

New Jersey and to store those packaging products for eventual use. Toscana is leasing storage space in Cliffside Park, New Jersey specifically to store cheese packaging products such as that used for ANCO.

17.     Following the packaging of the cheese ordered by ANCO, Toscana would then deliver the cheese to ANCO at its facilities in New Jersey, and then in Florida.

## C.     ANCO's Recent Failure To Pay Toscana's Invoices

18.     Until recently, ANCO regularly ordered cheese products from Toscana, and paid Toscana within terms or nearly within terms. Toscana's invoices typically provide thirty days to pay for the cheese product being delivered to the customer.

19.     Upon information and belief, however, the ownership of Schratter has changed. With that change in ownership came a change in the regularity of payments for goods Toscana produced and provided to Anco or Corman. Despite Toscana's sales to ANCO, and the reselling of that cheese through ANCO and/or Corman, Schratter claimed it did not have enough funds to pay Toscana's invoices within the thirty day terms set forth in those invoices.

20.     Toscana continued to supply product to ANCO in light of the parties' long relationship, and reasonable belief that ANCO would pay the invoice, if not immediately, then within thirty days thereof.

21.     When ANCO did not pay the Toscana's invoices within sixty days of issuance, I inquired as to when the payment would be made. ANCO assured me the payment would be forthcoming and requested that Toscana continue to ship products in accordance with ANCO's purchase orders.

22.    Despite Toscana's deliveries to ANCO in accordance with its purchase orders, ANCO did not pay the August 25, 2017 invoice, or invoices that were subsequently issued, based on ANCO's assurances that such payments would be forthcoming.

23.    This course of events continued for September and October, 2017.  In response to Toscana's requests for payment, ANCO, through its principals Arno Leoni and Claude Balden would assure that payments would be made, while advising that it needed Toscana's cheese products to be delivered in order to generate the funds needed to pay Toscana. Toscana, induced by ANCO's assurances, continued to supply product to ANCO.

**D.    I Have Met With ANCO's Management On Two Separate Occasions To Address ANCO's Failure/Refusal To Pay The Outstanding Invoices**

24.    With ANCO's receivable growing on almost a daily basis, and with Toscana continuing to receive purchase orders from ANCO, I arranged a meeting with ANCO's management, Messrs. Balden and Leoni to discuss a plan to address ANCO's growing receivable to Toscana.

25.    I met with Messrs. Balden and Leoni in or about November, 2017. They, on behalf of ANCO did not deny or dispute the Receivable or any portion thereof.  Rather, they advised me that ANCO needed Toscana to continue delivering product so that it could generate funds to pay Toscana.  Messrs. Balden and Leoni assured me the Receivable would be paid in full.

26.    Toscana agreed to continue supplying product to ANCO, provided, however, ANCO paid in full for the product being delivered, and provided an additional payment of $25,000 or more was made to address the receivable.  In such manner, I sought to keep the Receivable from growing, while at the same time addressing the Receivable at least in part.

27.     Subsequent to that meeting, ANCO made a payment to cover product it was ordering but did not also make any payments to address the Receivable.  Yet, ANCO continued to submit purchase orders to Toscana, requesting that it begin the process of cheese-making so that ANCO could resell the products.

28.     I advised ANCO that Toscana would not accept any further purchase orders from ANCO and scheduled to meet with Messrs. Balden and Leoni yet again to further discuss and address the Receivable.

### E.     ANCO Agrees To Pay The Entire Receivable By On Or About January 12, 2018 Through Two Separate Lump Payments

29.     I had a second meeting with Messrs. Balden and Leoni in or about December, 2017.  With respect to ANCO's continued inability to pay down the Receivable, ANCO claimed it was having difficulties with its lender.  According to ANCO, its financing arrangement with its lender required all payments to be placed in a lockbox to be provided to the lender.  The lender exercised control over how much of the cash flow it would keep, and how much ANCO would be permitted to use.  ANCO claimed the lender was not permitting it access to enough funds to pay the Receivable.

30.     ANCO provided yet an additional proposal to Toscana to address the Receivable.  ANCO explained it was anticipating a payment from an investor to purchase shares in a company related to ANCO, Cognati Cheese Co., which would result in ANCO receiving $300,000 ("the Cognati transaction").  ANCO represented to me that the Cognati Transaction would close during the week of December 11, 2017 and that Toscana would be paid one half of the proceeds from that transaction, $150,000, during the week of December 18, 2017.

31.     ANCO also represented that it expected to be acquired by a third party ("the Sale of the Company Transaction"), and that it would pay the remaining Receivable (which

would be approximately $350,000 if the payment from the Cognati Transaction was made to Toscana) from the proceeds from the Sale of the Company transaction.  ANCO claimed the closing of that transaction would take place on January 12, 2018.

32.    By letter dated December 18, 2017, Toscana, through counsel, confirmed the terms of the foregoing agreement.  (See Exhibit C).

**F.    ANCO Fails To Make Any Payment From The Cognati Transaction And Issues A Form Letter To Its Vendors (Including Toscana) That It Would Be Acquired Through A Purchase Of Its Assets**

33.    ANCO did not proceed with the Cognati transaction and did not make any payment to Toscana, let alone the $150,000 payment it promised to make from the proceeds of that transaction.

34.    When I inquired about the status of the Cognati Transaction, ANCO claimed the putative purchaser of the Cognati shares would not advance payment for the shares because ANCO owed him more money from other transactions than he would have been required to pay for the shares.  Upon information and belief, ANCO refused to proceed with the Cognati transaction unless the putative purchaser advanced additional cash for the purchase of the shares.  Rather than proceed with the transaction by providing the putative purchaser with the Cognati shares in return for a forgiveness of $300,000 of the debt it owed the putative purchaser, ANCO elected not to proceed with the transaction.

35.    ANCO subsequently issued to Toscana a letter/notice from its parent, Schratter Foods, Inc.  The letter was addressed to ANCO's "partner" and announced that Schratter was selling the assets that "are used in the connection with their ANCO and Corman Divisions."  The letter did not advise Toscana what would happen with the Receivable, or whether it would be paid.  Indeed, contrary to the oral agreement I had with ANCO that the

balance of the Receivable would be paid at the closing of the transaction whereby ANCO was sold to a third party, the letter did not address whether or how Toscana would be paid as part of the sale transaction.

36.     Despite characterizing Toscana's support (and the support of ANCO's other vendors) as "the biggest asset of the Company," the letter in essence announces that ANCO would be cannibalized by way of its assets being sold, with no provision being put in place to pay ANCO's trade debts to its vendors, including Toscana.

37.     Thus, notwithstanding Toscana's and my efforts to preserve the relationship and to obtain payment for the goods indisputably delivered to and accepted by ANCO, it now appears that ANCO may proceed with the sale of its assets and not make any payment to Toscana.

38.     While Toscana struggles to remain in business, the equity holders in ANCO will be permitted to sell their shares in ANCO and walk away from the debts of the business.

39.     The Court should not permit ANCO and/or its principals to proceed in such matter.

40.     As a direct and proximate result of the foregoing, Toscana will suffer irreparable harm. As a small company, a loss of $582,201.95 based on ANCO's failure to pay will be disastrous to Toscana and may cause it to cease operations. Indeed, with such a large receivable, and no prospect for payment, Toscana's lenders may freeze lending to Toscana and cripple its ability to continue as a going concern. Further, given that the assets of ANCO/Corman will be purchased by a third party in the near future, leaving Anco/Corman as a

shell, Toscana will likely not obtain any further payment from ANCO following the sale to the third party.

      41.    In accordance with the foregoing, we are respectfully requesting the Court to enjoin and restrain ANCO from disbursing $582,201.95 (the Toscana Receivable) from sums obtained by ANCO at the closing on the sale of its assets to a third party, and to require ANCO to put the Toscana Receivable into an interest bearing escrow account for Toscana's benefit until this matter is concluded.

      I hereby certify that the foregoing factual statements made by me are true to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: January 3, 2018

VICTOR J. PAPARAZZO

## CERTIFICATION OF FACSIMILE SIGNATURE

JAMES E. TONREY, JR., an attorney-at-law of the State of New Jersey, by way of certification, says:

VICTOR J. PAPARAZZO has acknowledged the genuineness of his signature on the attached facsimile of his original signature. A copy with an original signature affixed will be filed, if requested, by the Court or adverse party.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED:  January 3, 2018

                                                 _____
                                                 JAMES E. TONREY, JR.

#9664113.1                          11

# EXHIBIT A



**SCHRATTER FOODS INC.**

December 18, 2017

Dear Partner,

After we officially took over in May of this year, it didn't take us long to understand that we needed to define a new organization, a new culture and a new strategy. We also quickly understood we will need a strategic partner to manage this unexpected turnaround and manage the future of Schratter Foods.

During this period your support was the biggest asset of the company. In an effort to preserve the relationship to you and many of our other vendors, it was decided as of December 14th, 2017, by the Board of Directors, to sell its assets that are used in the connection with their Anco and Corman Divisions to Atalanta Corporation and entities of the Gellert Global Group. All parties will work hard to ensure business continuity and close a transaction as smooth and as quickly as possible.

Atalanta Corporation is one of the largest privately held food importers in the USA. A family business since 1945, they are importing meats, cheeses, specialty and commodity grocery, and seafood to service foodservice, retail and manufacturing food customers nationwide. For more information, visit www.atalantacorp.com. Atalanta is a member of the Gellert Global Group of companies. A collection of food import companies across North America. For more information about the Gellert Global Group, visit www.gellertglobalgroup.com

We thank you for your support and your patience. It has been a great pleasure in working with you over the last few months.

Feel free to contact me should you have any questions.

Best Regards,

Arno Leoni
CEO of Schratter Foods, Inc.

# EXHIBIT B

RECEIVED

DEC 28 2017

SUPERIOR COURT OF NEW JERSEY
COUNTY OF HUDSON
CHANCERY DIVISION # 2

James E. Tonrey, Jr. (Atty Id. No. 039821994)
WILENTZ, GOLDMAN & SPITZER P.A.
Attorneys at Law
90 Woodbridge Center Drive
Woodbridge, New Jersey 07095
(732) 636-8000
Attorneys for Plaintiff
Toscana Cheese Co., Inc.

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
HUDSON COUNTY
DOCKET NO.:

-----------------------------------------X
TOSCANA CHEESE CO., INC.,       :
              Plaintiff,        :
                                :
v.                              :
                                :
SCHRATTER FOODS, INC. d/b/a ANCO :
FINE CHEESE, INC. and d/b/a     :
CORMAN SHIP SUPPLIES, INC.,     :
                                :
              Defendants.       :
-----------------------------------------X

Civil Action

**COMPLAINT**

Toscana Cheese Company, Inc. ("Toscana") as and for its Complaint against

Schratter Foods, Inc. d/b/a ANCO Fine Cheese, Inc. ("ANCO") and d/b/a Corman Ship Supplies

("Corman") (hereinafter, together, "ANCO" unless stated otherwise) by and through its

undersigned attorneys, states and alleges as follows.

## NATURE OF THE ACTION

1.    This is a lawsuit whereby Toscana seeks payment in full of over $500,000

("the Receivable") ANCO owes for cheese products (and packaging) delivered to and accepted

by ANCO.

2.    ANCO does not dispute it is liable for the entire Receivable.  To the

contrary, ANCO has repeatedly promised Toscana that the entire Receivable will be paid in full.

#9653552.1

Yet, the dates by which ANCO promised to perform have come and gone, without performance by ANCO, leaving the Receivable unpaid.

3.    Toscana recently learned ANCO is planning to engage in a sale of its assets whereby a third party will purchase ANCO's assets, leaving ANCO an empty shell corporation, while the equity holders walk away with the payment for their shares of ANCO, and leaving Toscana (and, upon information and belief all other trade creditors of ANCO) with no ability to collect what it is owed.

4.    By way of this lawsuit, Toscana is asserting claims of breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, fraudulent inducement and fraudulent conveyance.  Toscana seeks an award of damages, as well as the imposition of a constructive trust on funds ANCO obtains as a result of its sale of its assets, in an amount sufficient to pay the Receivable and all related costs, as well as further related relief.

**JURISDICTION**

5.    This Court has personal jurisdiction over Defendants given their purposeful, intentional contacts with the State of New Jersey to order cheese and specialty cheese products from Toscana in New Jersey, the cheese and specialty cheese products were to be manufactured in New Jersey at Toscana's facility, the products were picked up at Toscana's facility in New Jersey by Defendants and the present lawsuit arises directly out of Defendants' contacts with the State of New Jersey.

6.    Venue is appropriate in the Superior Court of New Jersey, Hudson County given that Toscana is located in Hudson County, New Jersey, and a substantial part of the conduct underlying this lawsuit occurred in Hudson County.

#9653552.1

2

## FACTUAL BACKGROUND

A.    **The Parties**

7.    Toscana is a corporation of the State of New Jersey, with an office located at 575 Winsor Drive, Secaucus, NJ 07094. Toscana is involved in the manufacturing, sale and distribution of cheese products.

8.    Schratter is a corporation of the State of Delaware with an office located at 11421 NW 107th Street, Suite 1, Miami Florida 33178. Schratter is in the cheese processing business. Prior to relocating to Florida within approximately the last year, Schratter had its principal office located in Fairfield, New Jersey.

9.    Anco is a division of Schratter, and is the trade name under which Schratter imports and sells cheese products and specialty cheese products. Anco's address is 11421 NW 107th Street, Suite 1, Miami Florida 33178. Prior to relocating to Florida within approximately the last year, Anco conducted its business in Fairfield, New Jersey and Moonachie, New Jersey.

10.    Corman is also a division of Schratter and is the entity through which Schratter conducts its ship chandling business (i.e., supplies luxury cruise ships with cheese products). Prior to relocating to Florida within approximately the last year, Corman conducted its business in Fairfield, New Jersey and Moonachie, New Jersey.

B.    **ANCO Has Purchased Cheese Products From Toscana For Many Years**

11.    Since at least the year 2001, ANCO (meaning ANCO and Corman, as indicated above) located in New Jersey, has purchased cheese products from Toscana's headquarters in New Jersey and have resold those cheese products to various customers across the United States.

12.    To obtain the cheese products it needs, the process ANCO has followed for many years is that it places an order with Toscana, following which Toscana prepared at its cheese

manufacturing facility in New Jersey the cheese product ANCO ordered, packaged it, and delivered the product to ANCO facility in New Jersey or ANCO picked up those products at Toscana's facility in New Jersey. Since ANCO moved its facility to Florida, the process remains the same, with ANCO ordering product from Toscana in New Jersey, Toscana making the product in New Jersey, and Toscana then delivering the product to ANCO, or ANCO having the goods picked up from Toscana's facility in New Jersey.

13.     To obtain payment from ANCO for the cheese products, Toscana issues invoices to ANCO, the terms of which require payment  within thirty days of delivery of the cheese product.

C.     **The Parties' Agreements**

14.     Toscana and ANCO entered into a series of written contractual agreements over the years.  Typically, after the 5 year term of the agreements expired, the parties would simply renew the preexisting agreement.

15.     On or about January 1, 2017, Toscana provided a new form of agreement ("the Agreement") to ANCO (and its related companies, Schratter t) and Corman ).  ANCO, Schratter and Corman executed the Agreement.

16.     Pursuant to the Agreement, ANCO agreed to purchase from Toscana its requirements for Mozzarella Products intended to bear a label owned by ANCO.  Agreement, ¶ 1.1(2).

17.     Toscana agreed to provide ANCO with the mozzarella products at such times and in such quantities as set forth in ANCO's purchase orders.

18.     In fulfilling ANCO's purchase orders, Toscana duly provided ANCO with invoices, requiring payment in full within thirty days of the date thereof.

#9653552.1

**D.    ANCO Ceased Paying For Goods Delivered By Toscana And Accepted By ANCO**

19.    ANCO ordered certain cheese products from Toscana in mid- 2017. To purchase those products, ANCO contacted Toscana in New Jersey, just as it had always done in the past, requested Toscana in New Jersey to manufacture the cheese being ordered, and either had Toscana deliver the cheese products to ANCO's facility in Florida or itself picked up the cheese products at Toscana's facility.

20.    Toscana duly supplied ANCO with the cheese products ANCO ordered. The deliveries to ANCO conformed in all respects with the orders by ANCO. At no time did ANCO reject cheese products supplied by Toscana or otherwise object to the products supplied by Toscana.

21.    Toscana produced in New Jersey the products ANCO ordered. While ANCO was obligated to pay for those products no later than thirty days following delivery, ANCO failed and refused to pay Toscana's invoices.

22.    Toscana continued to supply product to ANCO in light of the parties' long relationship, and reasonable belief that ANCO would pay the invoice, if not immediately, then within thirty days thereof.

23.    When ANCO did not pay the Toscana's invoices within sixty days of issuance, Toscana inquired as to when the payment would be made. ANCO assured Toscana the payment would be forthcoming and requested that Toscana continue to ship products in accordance with ANCO's purchase orders.

24.    Despite Toscana's deliveries to ANCO in accordance with its purchase orders, ANCO did not pay the August 25, 2017 invoice, or invoices that were subsequently issued, based on ANCO's assurances that such payments would be forthcoming.

25.     This course of events continued for September and October, 2017. In response to Toscana's requests for payment, ANCO would assure that payments would be made, while advising that it needed Toscana's cheese products to be delivered in order to generate the funds needed to pay Toscana. Toscana, induced by ANCO's assurances, continued to supply product to ANCO.

E.     **Toscana's President Meets With ANCO's Management On Two Separate Occasions To Address ANCO's Failure/Refusal To Pay The Outstanding Invoices**

26.     With ANCO's receivable growing on almost a daily basis, and with Toscana continuing to receive purchase orders from ANCO, Toscana's President, Victor Paparazzo, arranged a meeting with ANCO's management to discuss a plan to address ANCO's growing receivable to Toscana.

27.     Mr. Paparazzo met with ANCO in or about November, 2017. ANCO did not deny or dispute the Receivable or any portion thereof. Rather, ANCO advised Mr. Paparazzo that it needed Toscana to continue delivering product so that it could generate funds to pay Toscana. ANCO assured Mr. Paparazzo the Receivable would be paid in full.

28.     Toscana agreed to continue supplying product to ANCO, provided, however, ANCO paid in full for the product being delivered, and provided an additional payment of $25,000 or more was made to address the receivable. In such manner, Toscana sought to keep the Receivable from growing, while at the same time addressing the Receivable at least in part.

29.     Subsequent to that meeting, ANCO made a payment to cover product it was ordering but did not also make any payments to address the Receivable. Yet, ANCO continued to submit purchase orders to Toscana, requesting that it begin the process of cheese-making so that ANCO could resell the products.

30.   Mr. Paparazzo advised ANCO Toscana would not accept any further purchase orders from ANCO and scheduled to meet with ANCO's management yet again to further discuss and address the Receivable.

**F.   ANCO Agrees To Pay The Entire Receivable By On Or About January 12, 2018 Through Two Separate Lump Payments**

31.   The second meeting between ANCO and Mr. Paparazzo occurred in or about December, 2017.  With respect to ANCO's continued inability to pay down the Receivable, ANCO claimed it was having difficulties with its lender.  According to ANCO, its financing arrangement with its lender required all payments to be placed in a lockbox to be provided to the lender.  The lender exercised control over how much of the cash flow it would keep, and how much ANCO would be permitted to use.  ANCO claimed the lender was not permitting it access to enough funds to pay the Receivable.

32.   ANCO provided yet an additional proposal to Toscana to address the Receivable. ANCO explained it was anticipating a payment from an investor to purchase shares in a company related to ANCO, Cognati Cheese Co., which would result in ANCO receiving $300,000 ("the Cognati transaction").  ANCO represented to Mr. Paparazzo that the Cognati Transaction would close during the week of December 11, 2017 and that Toscana would be paid one half of the proceeds from that transaction, $150,000 during the week of December 18, 2017.

33.   ANCO also represented that it expected to be acquired by a third party ("the Sale of the Company Transaction"), and that it would pay the remaining Receivable (which would be approximately $350,000 if the payment from the Cognati Transaction was made to Toscana) from the proceeds from the Sale of the Company transaction.  ANCO claimed the closing of that transaction would take place on January 12, 2018.

34.    By letter dated December 18, 2017, Toscana, through counsel, confirmed the terms of the foregoing agreement.

**G.    ANCO Fails To Make Any Payment From The Cognati Transaction And Issues A Letter To Its Vendors (Including Toscana) That It Would Be Acquired Through A Purchase Of Its Assets**

35.    ANCO did not proceed with the Cognati transaction and did not make any payment to Toscana, let alone the $150,000 payment it promised to make from the proceeds of that transaction.

36.    Upon inquiry by Mr. Paparazzo, ANCO claimed the putative purchaser of the Cognati shares would not advance payment for the shares because ANCO owed him more money from other transactions than he would have been required to pay for the shares. Upon information and belief, ANCO refused to proceed with the Cognati transaction unless the putative purchaser advanced additional cash for the purchase of the shares. Rather than proceed with the transaction by providing the putative purchaser with the Cognati shares in return for a forgiveness of $300,000 of the debt it owed the putative purchaser, ANCO elected not to proceed with the transaction.

37.    ANCO subsequently issued to Toscana a letter/notice from its parent, Schratter Foods, Inc. The letter was addressed to ANCO's "partner" and announced that Schratter was selling the assets that "are used in the connection with their Anco and Corman Divisions." The letter did not advise Toscana what would happen with the Receivable, or whether it would be paid. Indeed, contrary to the oral agreement Mr. Paparazzo had with ANCO that the balance of the Receivable would be paid at the closing of the transaction whereby ANCO was sold to a third party, the letter did not address whether or how Toscana would be paid as part of the sale transaction.

#9653552.1

8

38.     Despite characterizing Toscana's support (and the support of ANCO's other vendors) as "the biggest asset of the Company," the letter in essence announces that ANCO would be cannibalized by way of its assets being sold, with no provision being put in place to pay ANCO's trade debts to its vendors, including Toscana.

39.     Thus, notwithstanding Toscana's efforts to preserve the relationship and to obtain payment for the goods indisputably delivered to and accepted by ANCO, it now appears that ANCO may proceed with the sale of its assets and not make any payment to Toscana.

40.     While Toscana struggles to remain in business, the equity holders in ANCO will be permitted to sell their shares in ANCO and walk away from the debts of the business.

41.     The Court should not permit ANCO and/or its principals to proceed in such matter.

42.     As a direct and proximate result of the foregoing, Toscana will suffer irreparable harm.   As a small company, a loss of $500,000 based on ANCO's failure to pay will be disastrous to Toscana and may cause it to cease operations.  Indeed, with such a large receivable, and no prospect for payment, Toscana's lenders may freeze lending to Toscana and cripple its ability to continue as a going concern.  Further, given that the assets of ANCO/Corman will be purchased by a third party in the near future, leaving Anco/Corman as a shell, Toscana will likely not obtain any further payment from ANCO following the sale to the third party.

## COUNT ONE

### (Breach of Contract)

43.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

44.     ANCO placed purchase orders with Toscana for the delivery of cheese products.

45.     Toscana fulfilled those purchase orders in accordance with the Supply Agreement, and duly issued invoices for the cheese products delivered to and accepted by ANCO. The invoices required payment within thirty days of delivery.

46.     ANCO breached the supply agreement by failing and refusing to make payment of Toscana's invoices beginning in August, 2017 and continuing through December, 2017, and ANCO presently owes Toscana in excess of $500,000 for cheese products delivered to and accepted by ANCO.

47.     As a direct and proximate result of the foregoing, Toscana has suffered substantial damages.

COUNT TWO

(Breach of the Implied Covenant of Good Faith and Fair Dealing)

48.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

49.     There is implied in every agreement in the state of New Jersey a covenant of good faith and fair dealing

50.     The conduct by ANCO in denying Toscana the benefits of the Supply Agreement constitutes a breach of the implied covenant of good faith and fair dealing.

51.     As a direct and proximate result thereof, Toscana has suffered damages.

COUNT THREE

(Unjust Enrichment)

52.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

53.     By failing to pay for the cheese products shipped to and accepted by ANCO, without paying for such cheese products, ANCO has received unjust enrichment at the expense of Toscana.

54.     As a direct and proximate result of the foregoing, Toscana has suffered damages.

## COUNT FOUR

### (Fraudulent Inducement)

55.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

56.     During the meetings with ANCO's representatives, ANCO represented, through its employees, agents, and/or managers/owners that Toscana would be paid the entirety of the Receivable.

57.     At the time those representations were made, they were knowingly false, and made to induce Toscana into continuing to supply product to ANCO.

58.     As a result of relying on the representations of ANCO, Toscana shipped additional products to ANCO, thereby increasing the amount of the receivable.

59.     ANCO did not have and does not have the funds to pay the Receivable.  Toscana has suffered damages as a result of the knowingly false representations made by ANCO through its agents, and reliance on such representations in shipping product to ANCO.

60.     As a direct and proximate result of the foregoing, Toscana has suffered damages.

## COUNT FIVE

### (Fraudulent Conveyance)

61.     Toscana repeats and realleges herein each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

62.     The assets of ANCO are being sold to a third party purchaser with actual intent to hinder, delay or defraud Toscana from collecting the Receivable.

63.     The actual intent of ANCO to hinder, delay or defraud Toscana is demonstrated by the fact that insiders of ANCO, the officer/director equity holders, are retaining the value of ANCO's assets, i.e., cash, following the transaction; ANCO was sued or threatened with suit prior to the transaction; the transfer is for substantially all of ANCO's assets, and the sale of ANCO's assets occurred shortly after ANCO incurred a substantial debt to Toscana.

64.     Toscana, a creditor of the debtor, ANCO, has, and will continue to suffer substantial damages in the event ANCO is permitted to distribute to the equity holders of the Company the funds obtained from the sale of ANCO's assets.

WHEREFORE, Toscana demands judgment against ANCO on all counts of this complaint as follows:

a.     Awarding compensatory damages;

b.     Awarding consequential damages;

c.     Awarding incidental damages, including prejudgment interest;

d.     Enjoining and requiring ANCO to place all funds received from the sale of its assets into an Escrow Account;

e.     Enjoining ANCO from dissipating any of the funds received from the sale of its assets;

f.     Imposing a constructive trust in an amount equivalent to the Receivable on the funds ANCO receives from sale of its assets;

g.     Awarding attorneys fees and costs of suit;

h.     Awarding such other and further relief as the Court deems appropriate.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, James E. Tonrey, Jr. is hereby designated as trial counsel.

## CERTIFICATION PURSUANT TO RULE 4:5-1

I certify that, to the best of my knowledge, information and belief, that the matter in controversy herein is not the subject of any other proceeding pending in any court of any pending arbitration proceeding, that no other action or arbitration is contemplated, and that I am aware of no other party that should be joined in this action.

## RULE 4:5-1(b)(c) CERTIFICATION

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

DATED: December 22, 2017

WILENTZ, GOLDMAN & SPITZER, P.A.

BY: _____
JAMES E. TONREY, JR.

#9653552.1

13

# EXHIBIT  C



## WILENTZ
Attorneys at Law

**JAMES E. TONREY, JR., ESQ.**

T: 732.855.6199
F: 732.726.6561
jtonrey@wilentz.com

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000

December 18, 2017

Mr. Claude Blandin
Anco Fine Cheese
11421 NW 107th Street
Suite 1
Miami, Florida  33178

Mr. Arno Leoni
Anco Fine Cheese
11421 NW 107th Street
Suite 1
Miami, Florida  3178

Re:   **Outstanding Receivables to Toscana Cheese Company, Inc.**

Dear Messrs. Blandin and Leoni:

This law firm represents Toscana Cheese Company, Inc. ("Toscana") concerning the above-referenced matter.

As you are aware, Anco Fine Cheese ("Anco") owes Toscana approximately $500,000 ("the Receivable") for cheese products delivered to and accepted by Anco.  Approximately $300,000 of the outstanding receivable is more than 90 days past due.

This is not acceptable to Toscana.  Given the age and amount of the Receivable, Toscana's lenders have frozen any lending for all amounts over sixty days, which, of course has had an adverse impact on Toscana's finances and ability to conduct its business.

The parties have met on a number of occasions at Anco's facility in Miami, Florida to address the outstanding receivable.  Despite the parties' communications and Anco's promises to pay the Receivable, little progress has been made, to date, and the Receivable remains.



Mr. Arno Leoni
Mr. Claude Blandin
December 18, 2017
Page 2

During Mr. Paparazzo's last meeting with you in Florida, the parties reached an agreement to have the Receivable paid in full by on or around January 15, 2017.  Please allow this letter to confirm the terms of that agreement, as follows.

Anco will pay to Toscana the sum of $150,000 by no later than Wednesday, December 20, 2017.  You have advised Mr. Paparazzo that Anco will be selling its 20% share of Cognatti Cheese Co. for $300,000 in a transaction that will close on or about December 15, 2017.  You will pay one-half of that sum, $150,000, to Toscana as aforesaid, on or before December 20, 2017.  Toscana will apply such payment towards Anco's oldest outstanding invoices.

Additionally, Anco will pay Toscana the balance of the Receivable (approximately $350,000 after deducting the $150,000 payment as aforesaid) by on or before January 15, 2018.  You have advised Mr. Paparazzo that Anco has entered into an agreement to be purchased by a third party.  You have agreed to pay Toscana the balance owed as part of the closing of that transaction, which is to occur on or before January 15, 2018.

In the interim, to continue obtaining product from Toscana, you have agreed that Anco will pay for any new deliveries, in full on a going forward basis, together with a minimum additional payment of $25,000 to address the outstanding receivable.

Toscana is not in a position to continue carrying Anco's outstanding receivable.  Toscana expects strict adherence to the terms of your agreement with payments being made in accordance with the foregoing.  In the event there is deviation from any of the foregoing terms, Toscana reserves the right to commence the appropriate judicial action and to pursue any and all remedies available to it.

Toscana has been, and remains committed to working with Anco to resolve this matter satisfactorily and appreciates the efforts undertaken by Anco in this regard.

We look forward to Anco's payment in full of the Receivable in accordance with the foregoing.

Very truly yours,

WILENTZ, GOLDMAN & SPITZER, P.A.

By: _____

JAMES E. TONREY, JR.

#9643142.1

# EXHIBIT E



**JAMES E. TONREY, JR., ESQ.**

T: 732.855.6199
F: 732.726.6561
jtonrey@wilentz.com

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000

January 3, 2018

**HAND DELIVERY**
Hon. Barry P. Sarkisian, P.J., Chancery Division
Hudson County Superior Court
Brennan Courthouse
583 Newark Avenue
Jersey City, New Jersey 07306

    Re:    **Toscana Cheese Corp., Inc. v. Schratter Foods, Inc., et al.**
           **Docket No.:  C-190-17**

Dear Judge Sarkisian:

    This law firm represents Plaintiff, Toscana Cheese Company, Inc. ("Toscana") in the above-referenced matter.

    Please find enclosed herewith a courtesy copy of Toscana's application, filed today, seeking the entry of an order to show cause with temporary restraints.

    We are requesting the Court's expedited consideration of this application. As detailed in the accompanying papers, Toscana is seeking temporary restraints enjoining and requiring the Defendant, Schratter Foods d/b/a ANCO Fine Cheese, Inc. and Corman Ship Supplies, Inc. to refrain from disbursing the sum of $582,201.95 from cash it will receive from the upcoming sale of its assets scheduled for January 12, 2018 and to deposit same in an interest-bearing escrow account pending conclusion of this matter. Given the aforesaid transaction is scheduled to take place in less than two weeks, we are respectfully requesting the Court's consideration of this matter on an expedited basis and to enter the requested temporary restraint.

    We are providing a copy of this application to counsel for the Defendant contemporaneously with filing it.



Hon. Barry P. Sarkisian, P.J., Ch.
January 3, 2018
Page 2

We thank the Court for considering this matter.

Respectfully submitted,

WILENTZ, GOLDMAN & SPITZER, P.A.

BY: *James E. Tonrey*

JAMES E. TONREY, JR.

JET:lk
enclosures
cc:    Clerk, Chancery Division (Hand Delivery)
       Oscar Gomez, Esq. (via email and UPS overnight mail)

# EXHIBIT F



**WILENTZ**
Attorneys at Law

**JAMES E. TONREY, JR., ESQ.**

T: 732.855.6199
F: 732.726.6561
jtonrey@wilentz.com

90 Woodbridge Center Drive
Suite 900 Box 10
Woodbridge, NJ 07095-0958
732.636.8000

January 3, 2018

<u>**HAND DELIVERY**</u>

Clerk, Chancery Division
Hudson County Superior Court
Brennan Courthouse
583 Newark Avenue
Jersey City, New Jersey 07306

        **Re:**    **Toscana Cheese Corp., Inc. v. Schratter Foods, Inc., et al.**
                 **Docket No.:  C-190-17**

Dear Sir/Madam:

    This law firm represents Plaintiff, Toscana Cheese Company, Inc. ("Toscana") in the above-referenced matter. Please find enclosed herewith for filing on behalf of Toscana an original and two copies of the following documents in support of Toscana's application for the entry of an order to show cause with temporary restraints:

        1.      Proposed order to show cause with temporary restraints;

        2.      Brief in support of the application;

        3.      Certification of Victor J. Paparazzo, dated January 3, 2018; and

        4.      Certification of Service.

    Kindly file the originals and return to our waiting messenger a copy of each document stamped "filed." Please charge the filing fee to this firm's account with the Superior Court, No. 1019700.


WILENTZ
Attorneys at Law

Clerk, Chancery Division
January 3, 2018
Page 2

Please also note that we are providing a courtesy copy of this application directly to Judge Sarkisian.

Thank you for your cooperation with this matter.

Very truly yours,

WILENTZ, GOLDMAN & SPITZER, P.A.

BY: *James E. Tonrey*

JAMES E. TONREY, JR.

DET:lk
enclosures
cc:    Hon. Barry P. Sarkisian (P.J. Ch.) (w/encl.) (via hand Delivery)
       Oscar Gomez, Esq. (w/encl.) (via email and UPS overnight mail)